THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ELBER COOPER LUCAS, DEFENDANT-APPELLANT.

Argued April 6, 1959—Decided June 1, 1959.

38

⚷48

*Mr. Martin L. Haines* argued the cause for the defendant-appellant (*Messrs. Dimon, Haines & Hunting,* and *Messrs. Abbotts & Abbotts,* and *Mr. John A. Hartpence,* attorneys).

*Mr. John J. Barry,* First Assistant Prosecutor of Mercer County, argued the cause for the plaintiff-respondent (*Mr. Stanley E. Rutkowski,* Mercer County Prosecutor).

The opinion of the court was delivered by

BURLING, J. Defendant has taken an appeal to this court from a judgment of conviction entered pursuant to a jury verdict of murder in the first degree with recommendation of life imprisonment. 1947 *Const., Art.* VI, § V, *par.* 1(*c*); *R. R.* 1:2–1(*c*).

Evidence was presented by the State that in the early hours of the rainy morning of March 14, 1956, some time about 4:00 A. M., a fire broke out in St. Mary's Cathedral and Rectory located on North Warren and Bank Streets in the City of Trenton. The fire, which lasted for 19 hours, destroyed the Cathedral and adjoining rectory which was also used as an office building. The death of Monsignor Richard T. Crean, Mary Brennan and Mary P. Donnellan, three occupants of the rectory, ensued as a result of the fire.

When the firemen arrived, shortly after 4:30 A. M., the only portion of the first floor of the rectory which was afire was a room utilized as an office located on the extreme left (southerly side) of the building adjacent to a funeral home. The upper floors of the rectory were ablaze, but the fire had not yet spread to the Cathedral building. Upon abatement of the flames, firemen entered and made an inspection of the building. The electrical wiring, heating equipment, incinerator, "everything" was checked by the Fire Department, but nothing was found indicating the origin of the blaze and the cause of the fire was officially listed as "unknown." However, the point of origin and path were ascertained to be in the previously mentioned office. Deputy Fire Chief Dovgala testified for the State as to his basis for opining that the fire started in the rear center portion of the rectory office and proceeded to a stairway in the rear of the office, reaching the upper floors via the stairway.

The Trenton Police Department also conducted an investigation into the origin of the fire. The debris on the floor of the rectory office was sifted. There was a huge pile of debris in the rear center portion of the office at about the believed point of origin of the fire. Eight fragments of

a glass container, which could not be identified by those familiar with the contents of the room, were found at the bottom or floor level of the pile of debris.

As a result of their investigation the police were of the opinion that the cause of the fire was other than accidental.

The layout and contents of the office were described by Edith Egan, who occupied the room during the day and was a receptionist and telephone operator employed by the Diocese of Trenton. The contents of the room were as follows: There was a large steel desk and chair which she utilized located towards the front of the room; against the wall on the left (facing the building from Warren Street) *i. e.,* the wall next to the funeral home, there were five chairs which were sample chairs for a new high school; in the wall on the right, closest to the Cathedral and adjacent to the entrance hall, there was a fireplace. On the mantel were numerous telephone directories, for each of the counties in New Jersey and some for New York and Pennsylvania. In the front wall, adjacent to Warren Street, there were windows with full curtains. After business hours the curtains would be pulled halfway.

Some nine months after the fire, on the morning of December 17, 1956, at approximately 2:15 A. M., the defendant Lucas was observed by a police officer walking on South Warren Street, near Front Street in Trenton. His demeanor aroused the suspicion of the officer, who stopped Lucas and had him empty the contents of his pockets. The search revealed that Lucas was carrying seven packs of matches, numerous religious pamphlets and a newspaper clipping of a picture of the late Monsignor Crean. Upon the failure of the defendant to satisfactorily explain why he was carrying these articles, he was taken to the Detective Bureau.

Commencing at 10:30 A. M. on the morning of December 17, Lucas was questioned by the police for approximately an hour and 15 minutes, during which time he admitted setting fire to another church, not here in question. After

an interruption of an hour for lunch, he was again questioned for an hour and a half. During this interrogation Lucas admitted setting fire to three other churches in the Trenton area, but again not the Cathedral. The interrogation on December 17 terminated at about 4:00 P. M.

On the morning of the following day Lucas agreed to visit certain of the churches he had admitted burning. Shortly after 11:40 A. M. Lucas, accompanied by police officers, proceeded to several churches in Trenton where Lucas re-enacted the manner in which he set the fires. The group then had lunch and returned to the Detective Bureau shortly before 2:00 P. M. Lucas then stated he would like to rest and after he rested he might talk about the Cathedral fire. He rested for about an hour. Detective Sergeant Bradley of the Trenton Police Department testified for the State that at approximately 3:00 P. M. Lucas was again interrogated and at that time admitted that he set the fire, adding, "I am sorry, I didn't know anyone lived there." Lucas admitted that he started the fire in a room which he referred to as a library; that he removed some books from a shelf in the room located to the right of the door as he entered, placed them on the floor and, after saturating them with gasoline, he set fire to them. When shown the fragments of glass found at the scene he stated that they looked like fragments from the glass container in which he had transported the gasoline and which he left at the scene, although he was not certain.

Lucas admitted starting the fire at 4 A. M. in the room next to Murphy's Funeral Home which he had described as a library because of the presence of books on the shelf. He entered the room by the door next to the funeral home which he said was not locked. Lucas described the contents of the room. In addition to the shelf with the books on it to the right of the door, he said it had a desk, a table, a chair and that there were some chairs piled up against the wall that separates the funeral home from the rectory building.

Lucas stated that he had purchased the gasoline at a gasoline station on North Warren Street immediately before the fire. (The station was open 24 hours a day.) He further testified that it was raining on the night of the fire.

Lieutenant Bloking, in an effort to test the veracity of Lucas' admissions, gave him false information concerning the fire:

He told him the police had information that the fire started "around midnight, between 12 and 1 a. m.," but Lucas said, "No," "that was wrong; that he had started it between 4 a. m. and 4:30." Lieutenant Bloking then told him that there was a snowstorm that night; but Lucas insisted that it had been raining and nasty. He was informed that the police believed that the fire started in the area of the altar of the Cathedral itself; Lucas said "No," that it had started in the library next to the funeral home. Bloking told him that the police had evidence that an explosive had been part of the igniting force used to set the fire; but again Lucas adhered to his original story, saying he had poured gasoline over some of the books and papers in the library and then set fire to them.

The interrogation terminated at 3:45 p. m., at which time Lucas was taken to the office of the Chief of Police James DiLouie. Chief DiLouie explained the extreme gravity of his admissions to Lucas and inquired if he understood the import of what he admitted. When Lucas replied affirmatively he was then asked to repeat his version of the crime for Chief DiLouie. The interrogations for the day terminated at 4:30 p. m.

On the ensuing day, December 19, 1956, Lucas was again questioned, this time by Prosecutor Mario Volpe, from 11 a. m. to 2 p. m., with a respite for luncheon. The questions and answers were transcribed stenographically by a certified shorthand reporter. During the period of questioning two separate statements were taken. The one relating to the Cathedral fire was taken in the afternoon and was admitted in evidence at the trial. Present at the time the

statements were taken, in addition to the prosecutor and police officers, was Dr. Spradley, the State's psychiatrist. In it Lucas reiterated at length his oral admissions of the previous day. On the night in question, which Lucas described as "rainy, nasty," he stayed at the Hotel Penn in Trenton. He left the hotel at about 4 A. M. to go to a gasoline station on Warren Street above (north of) the church. He purchased the gasoline in a bottle which he had wrapped in a paper bag. (He had picked up the bottle on the street along the way.) Upon being shown the fragments of glass, Lucas stated that the bottle he had used was "something like that." After purchasing the gasoline he proceeded south on Warren Street toward the church. He entered the southerly door of the rectory building, next to Murphy's Funeral Home which was unlocked, and entered the "library" (the rectory office). He had never been in the rectory building of the church before, although he had attended services in the Cathedral. As he walked in "there was a bunch of books on the righthand side * * * paper books, [he] poured gasoline over them and set fire to them with matches." Lucas described the contents of the room, including the chairs located on the southernmost wall.

After the fire started flaming, he walked out and went toward Perry Street where he stopped at the bus station, got a drink of water, and then proceeded toward Clinton Street where he was to meet his employer at the intersection of Clinton and Perry Streets (Lucas was employed as a helper by a pie truck driver and generally commenced work at 5 A. M.) At a later point in the statement Lucas said that he remained in the room "a couple of minutes, about five minutes" after he lit the fire and saw a "lot of flames."

During the questioning, when asked whether he attended Monsignor Crean's funeral (he had known the Monsignor a short time and occasionally talked with him about baseball), he broke down and cried.

Lucas had attempted to be converted to Catholicism. He said that he attended catechism classes at St. Mary's

Cathedral on one occasion, and prior to that had received instructions in Florence, New Jersey. He stated that he had an argument with one of the priests, whose name he did not know, at the Cathedral concerning communion and catechism. The priest had told Lucas that he had learned the catechism incorrectly; that "most of it was all wrong. He said we got it all wrong. I studied, I started an argument with him, said I was right." Asked, "But was that the reason why you set fire to the church?" he responded, "Yes." At a later point in the confession he contradicted himself by stating that he had no reason for burning the church. Lucas was then interviewed by Dr. Spradley for approximately an hour. The doctor found him to be sane at that time. At his own request he received a visitor at 6:05 P. M., Dr. Hugh Gard, pastor of the First Presbyterian Church in Trenton, with which Lucas had become associated in March of 1956 after the burning of St. Mary's Cathedral. Later in the evening, about 9:30 P. M., Lucas read aloud the statement which had since been typed by the stenographer. He made some corrections thereon.

On the morning of the following day, December 20, 1956, Lucas accompanied by police officers re-enacted the manner in which he started the fire. The re-enactment coincided with his confession and previous admissions to the police. Lucas proceeded down Warren Street to the southernmost rectory door, walked in and immediately turned to his left. He entered the rectory office where it was believed the fire had started and said, "this is the room where I set the fire." He then proceeded to demonstrate how he set the fire.

Lucas was arraigned on December 20, 1956 and incarcerated in the Mercer County Jail. On January 2, 1957 he was again examined by Dr. Spradley. Dr. Spradley at that time felt that if he remained in prison he would develop an acute psychosis, and therefore recommended he be committed to the State Hospital for observation and possible treatment. The next day, January 3, 1957, Lucas was transferred to the Trenton State Hospital where he remained

until March 3, 1958. On that date he was released free of any overt signs of psychosis.

On November 26, 1957 he was indicted for felony murder (arson) under *N. J. S.* 2A:113–1. He pleaded not guilty. At the trial the defenses were denial of the commission of the crime and alleged insanity at the time of its commission. The defendant did not take the stand.

Defense motions for a directed verdict of acquittal at the conclusion of the State's case and at the close of the entire case, and a motion for a new trial, were denied.

I.

CORROBORATION OF THE CONFESSION.

The defendant contends that the trial court committed error in the refusal to direct a verdict of acquittal at the conclusion of the State's case and the entire case because of insufficient corroboration of the confession.

█ It is a widely accepted doctrine reflected in either American decisional or statutory law that an uncorroborated extra-judicial confession cannot provide the evidential basis to sustain a conviction for crime. *Annotation,* 45 *A. L. R.* 2d 1316 (1956); 7 *Wigmore, Evidence* (3d ed. 1940), § 2070, p. 393; *Note, "Proof of the Corpus Delicti Aliunde the Defendant's Confession,"* 103 *U. of Pa. L. Rev.* 638 (1955).

The rule in New Jersey that a confession without more cannot sustain a conviction can be traced back through the decisional law to as early as 1818. *State v. Aaron,* 4 *N. J. L.* 231 [*Reprint pages* 269, 279, 282] (*Sup. Ct.* 1818). The doctrine, despite its widespread and apparently firmly rooted acceptance in American Jurisprudence, is not without its substantial critics. Judge Learned Hand in *Daeche v. United States,* 250 *F.* 566, 571 (2 *Cir.* 1918), remarked: "that the rule [requiring corroboration of confessions] has in fact any substantial necessity in justice, we are much disposed to doubt. * * * it seems to us that such evils as it

corrects could be much more flexibly treated by the judge at trial. * * *" Professor McCormick has recently observed:

"It is submitted that hard-and-fast rules requiring corroboration are as likely to obstruct the punishment of the guilty as they are to safeguard the innocent." *McCormick on Evidence, p.* 230, at *n.* 5 (1954).

Commenting upon the rule requiring corroboration of a confession, Massachusetts has alluded to it as "an artificial quantitative rule," and does not adhere to it. *Commonwealth v. Kimball,* 321 *Mass.* 290, 73 *N. E. 2d* 468, 470 (*Sup. Jud. Ct.* 1947). In Wisconsin, also, an uncorroborated confession may sustain a conviction for crime. *Potman v. State,* 259 *Wis.* 234, 47 *N. W. 2d* 884, 885 (*Sup. Ct.* 1951).

While the rule requiring corroboration is firmly entrenched, there is a conflict among the authorities concerning the *quantum* of proof independent of the confession which the State must introduce before the confession may be considered as evidential. One view is that the State must proffer independent proof of the *corpus delicti. Annotation, supra,* 45 *A. L. R. 2d* 1316, 1327. *Note, supra,* 103 *U. of Pa. L. Rev.,* at *note* 63, *p.* 647.

The other view is that the extrinsic corroborative proofs need not touch upon the *corpus delicti* but must be of such a nature as to give the confession an aura of authenticity. *Annotation,* 45 *A. L. R. 2d.,* at *p.* 1329; *Note, supra,* 103 *U. of Pa. L. Rev.,* at *p.* 665.

Under the latter view it is sufficient corroboration if the State introduces independent proof of such facts and circumstances as would tend to generate a belief that the confession is true; the evidence need not establish the *corpus delicti* independent of the confession. See *Opper v. United States,* 348 *U. S.* 84, 75 *S. Ct.* 158, 99 *L. Ed.* 101 (1954); *Anderson v. United States,* 124 *F. 2d* 58 (6 *Cir.* 1941), reversed on other grounds, 318 *U. S.* 350, 63 *S. Ct.* 599, 87 *L. Ed.* 829 (1943); *Martinez v. People,* 129 *Colo.* 94,

257 *P. 2d* 654 *(Colo. Sup. Ct.* 1954); *State v. Cardwell,* 90 *Kan.* 606, 135 *P.* 597, *L. R. A.* 1916*B,* 745 *(Sup. Ct.* 1913).

■ Before resolving the question of what the New Jersey corroboration rule requires it will be helpful to define the term *corpus delicti.* There are three basic elements in the proof of any crime.

First, the occurrence of loss or injury (a death in murder, a burnt dwelling house in common law arson, etc.) ; secondly, criminal causation of the loss or injury as opposed to accident (*i. e., some one* committed a crime), and lastly, the defendant's identity or connection with the crime (*i. e.,* that the defendant in fact was the perpetrator of the crime). 7 *Wigmore, Evidence* (*3d ed.* 1940), § 2072; 2 *Wharton, Criminal Evidence* (12*th ed.* 1955), *pp.* 130–131.

Dean Wigmore has suggested that in its correct meaning the term *corpus delicti* has reference only to the first of these elements, namely, the fact of the specific loss or injury sustained. 7 *Wigmore, supra, p.* 401. (Under this view the State in the instant case need only prove that the rectory was burned and that the death of someone ensued as the result thereof.) He goes on to state:

"This, too, is '*a priori*' the more natural meaning; for the contrast between the first and the other elements is what is emphasized by the rule; *i. e.* it warns us to be cautious in convicting, since it may subsequently appear that no one has sustained any loss at all; for example, a man has disappeared, but perhaps he may later reappear alive. To find that he is in truth dead, yet not by criminal violence—*i. e.* to find the second element lacking, is not the discovery against which the rule is designed to warn and protect us." (7 *Wigmore, p.* 401)

Nonetheless, Wigmore admits that the prevailing view is that the term *corpus delicti* also comprehends "the second element, *i. e.,* somebody's criminality." *Ibid,* at *p.* 502.

The decisions in New Jersey are somewhat ambiguous in their treatment of the immediate problem. Although the term *corpus delicti* has been defined to include both the specific loss or injury and a criminal agency causing the

loss or injury, *State v. Morris,* 98 *N. J. L.* 621 (*Sup. Ct.* 1923), affirmed on opinion below, 99 *N. J. L.* 526 (*E. & A.* 1923); *State v. Greely,* 11 *N. J.* 485, 488 (1953), yet the cases are not uniform with respect to whether both of these elements must be proved by evidence independent of the confession.

A reading of the New Jersey cases on the subject of independent corroborative proof *aliunde* the confession discloses that while it has been held that a confession, corroborated by independent proof of the *corpus delicti* will support a conviction for crime, yet, if such proof be lacking, it will suffice if the confession be corroborated by other evidence tending to strengthen it, so that the criminal agency (as well as defendant's connection with the crime) may be proven by the confession itself. *State v. Guild,* 10 *N. J. L.* 163 (*Sup. Ct.* 1828); *State v. Banusik,* 84 *N. J. L.* 640 (*E. & A.* 1906); *State v. Kwiatkowski,* 83 *N. J. L.* 650 (*E. & A.* 1912); *State v. James,* 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Geltzeiler,* 101 *N. J. L.* 415 (*E. & A.* 1925); *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Klausner,* 4 *N. J. Super.* 427 (*App. Div.* 1949); *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Campisi,* 42 *N. J. Super.* 138 (*App. Div.* 1956), appeal dismissed in part and reversed in part, 23 *N. J.* 513 (1957). In one of the earliest cases on the subject, *State v. Guild, supra,* Chief Justice Ewing obviously followed what Wigmore contended was the correct view of *corpus delicti* in discussing the rule that the confession must be corroborated by independent proof. The Chief Justice then set forth a number of authorities holding that a totally uncorroborated confession, if it be free and voluntary, was sufficient evidence to warrant a conviction, but found it unnecessary to decide the question of whether or not proof of corroborating circumstances was required, since he found such proof to exist in that case. He declared for the court:

"In the first place, however, it becomes material to a correct understanding of the subject, to settle what is meant by the qualifi-

cation, 'corroborating,' annexed to the term 'circumstances.' The phrase clearly does not mean facts which, independent of the confession, will warrant a conviction, for then the verdict would stand not on the confession, but upon those independent circumstances. To corroborate is to strengthen, to confirm by additional security, to add strength. The testimony of a witness, is said to be corroborated, when it is shown to correspond with the representation of some other witness, or to comport with some facts otherwise known or established. Corroborating circumstances then, used in reference to a confession, are such as serve to strengthen it, to render it more probable, such in short as may serve to impress a jury with a belief of its truth." (10 *N. J. L.*, at *page* 187).

In 1906 in *State v. Banusik, supra,* Chief Justice Gummere, in addressing an argument that the law will not permit a conviction to stand absent proof of criminal agency causing death, declared:

"But this, in our opinion, is not an accurate statement, either of the rule of law as to the proof required with relation to the *corpus delicti,* or the condition of the evidence upon the question whether a murder was committed. Full proof of the body of the crime, the *corpus delicti,* independently of the confession, is not required. It may be proved by the confession itself, corroborated by other evidence." (84 *N. J. L.,* at *pages* 646–647.)

But in *State v. Kwiatkowski, supra,* Chancellor Walker, speaking for the Court of Errors and Appeals, in a case where there was ample evidence of death through criminal agency, declared:

"The only limitation upon the use as evidence against him of a prisoner's confession of murder, voluntarily made, is the want of proof of the *corpus delicti.* If death, through criminal agency, be proved, and a man confesses to having caused that death, he may be convicted of murder on his confession." (83 *N. J. L.,* at *page* 660.)

In *State v. James, supra,* the Court of Errors and Appeals recognized that either rule would suffice in holding:

"* * * in this situation, namely, proof of the death of a person by foul means and the confession of a party that he murdered the man whose death is so proved, the law of this state is entirely

settled; for in *State v. Kwiatkowski*, 83 *N. J. L.* 650, this court held that the only limitation upon the use as evidence against him of a prisoner's confession of murder, voluntarily made, is the want of proof of *corpus delicti*. If death through criminal agency, be proved, and a man confesses to having caused that death, he may be convicted of murder on his confession. Furthermore, in *State v. Banusik*, 84 *N. J. L.* 640, this court held that in a prosecution for murder the *corpus delicti* may be proved by the confession made by the defendant which is corroborated by other evidence. The law does not require full proof of the body of the crime independent of such confession. * * *

As seen above, the *corpus delicti* was proved independently of the confession, but, if it were not, as contended for by the prisoner, still the confession was so thoroughly corroborated by other evidence that both together afforded full proof of the body of the crime." (96 *N. J. L.*, at *pages* 147, 148.)

In *State v. Geltzeiler, supra,* the court declared:

"In the history of the law so many persons are known to have confessed the commission of crimes they never committed, even including murder, that the rule requiring proof of the *corpus delicti* has been evolved. However, when there is a voluntary confession of the offense by the defendant in a criminal case, full proof of the body of the crime is not required in addition to the confession, but sufficient proof thereof may arise out of evidence corroborating some fact or facts in the confession itself." (101 *N. J. L.*, at *page* 416.)

See also *State v. Cooper, supra,* 10 *N. J.* at *page* 545, and *State v. Campisi, supra,* 42 *N. J. Super.* at *page* 145.

██ In our view, the test first enunciated in the *Guild* case, *i. e.,* that the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury, affords ample protection for the accused and is the rule best designed to serve the ends of justice in the administration of the criminal law.

Historically the doctrine of corroboration evolved from notorious instances both in England and the United States where individuals confessed to the murder of missing persons were convicted and hung on the sole strength of their confessions, and afterwards the alleged decedent returned

very much alive. See Note, *supra,* 103 *U. of Pa. L. Rev.,* at *pages* 638, 639, 646, and authorities therein cited.

The evil at which the corroboration rule was aimed was not that the death which was confessed to was in fact accidental rather than felonious, but rather that there was, in fact, no death at all. This objection is, as Dean Wigmore noted, overcome by the requirement that the State prove independently of the confession only the fact of loss or injury.

It might be argued that the State ought also to prove criminal agency before a confession be considered as evidential, in order to assure that confession was not the imaginary product of a mentally diseased or deficient mind. But if criminal agency must be proven *aliunde* the confession, why not the defendant's connection with the crime? There seems to be little difference in kind between convicting the innocent where no crime has been committed and convicting the innocent where a crime has been committed, but not by the accused. Yet, no jurisdiction imposes such a requirement, for that would in effect inverse the rule and render the confession merely corroborative of a crime independently proven. Indeed, it is ofttimes more likely that persons giving false confessions because of mental disease or defect will confess to crimes where there is abundant proof of the two elements of the *corpus delicti* but where there is no proof as to the perpetrator. The danger is not so much that such persons will confess to non-criminal occurrences but rather to crimes committed by some one other than themselves. Under such circumstances the confessor is probably afforded greater protection by the requirement that the State must introduce such independent corroborative proof of facts and circumstances tending to generate a belief in the trustworthiness of the confession than he is by the rule requiring independent proof of the *corpus delicti*.

■ Confessions, like other admissions against interest, stand high in the probative hierarchy of proof. It is for.

this reason that the law imposes various safeguards designed to assure that the confession is true. But safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment. No greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth, plus independent proof of the loss or injury.

■ In our view, the State's corroborating proofs *aliunde* the confession presented a question for the jury as to the trustworthiness of the confession.

Lucas stated that he set the fire at approximately 4:00 A. M. That the fire started about that time is beyond cavil from the proofs in the record. Lucas described the night as "rainy, nasty"—it had in fact rained all night on March 14. His description of having set the fire in the "library," *i. e.,* the rectory office, was corroborated by the evidence relating to the point of origin of the fire previously detailed. Lucas accurately described the layout and contents of the office, including the "paper books" on the mantel which caused him to think the room was a library, although by his own admission he had never been there before. Edith Egan, who occupied the room during the day, confirmed this by testifying that although she believed that she had seen Lucas in the Cathedral, he had never been in the office. The chairs lined up against one of the walls, which Lucas described, had only been in the office for several months prior to the fire.

Under a concentrated mass of rubble located at the point in the office where the fire was believed to have started, at the floor level, were the eight fragments of glass. While the State's proof would have been stronger had it been successful in attempts to identify the fragments, nonetheless these otherwise unaccounted for fragments of glass could have formed the basis for an inference by the trier of fact that they were the remains of the bottle in which Lucas claimed to have carried the gasoline and which he threw into the fire. The State further proved that charred telephone

books were found on the office floor, again mute confirmation of Lucas' story that he poured gasoline over some paper books which were on the mantel in the office. Also the spontaneity of Lucas' re-enactment of the crime corroborates his confession.

Defendant argues that the following circumstances negate the truth of the confession:

That Lucas' employer, Maxwell Kleinerman, testified that he picked Lucas up at between 4:48 and 5:00 A. M. on the morning of March 14. Though it had rained all night and was still raining, Kleinerman testified that Lucas' clothes were dry when he picked him up. Kleinerman further testified that he is allergic to the smell of gasoline, and though he and Lucas rode together in the truck for the remainder of the day, he could detect no smell of gasoline about Lucas. It should be noted that there is nothing in the record to indicate that Lucas spilled any of the gasoline on his clothing.

It may be noted that Kleinerman further testified that in jest he asked Lucas:

"if he had done, it, if he had set fire to the Cathedral, and he says, 'No, they can't pin that on me. I wasn't anywhere near there.'
Q. Did he say anything else about it?
A. Oh, he did say, 'I didn't know anybody lived there.' * * *
Q. And what were his precise words? * * *
A. 'I didn't know anyone lived there.'"

He also stated that although Lucas had a habit of crossing himself when they drove past the Cathedral, that practice, as well as his determination to convert to Catholicism, ceased after March 14, 1956.

That it was established that the doors by which Lucas claimed to have entered the rectory were usually locked at 9 or 9:30 P. M.; that the cook, returning home at about 11:10 P. M., used a key to enter the premises by those doors, and that the firemen, when they arrived at the rectory had to use a "Kelly tool" (an axe-like instrument) to force open the doors. Chief Dovgala testified that it was very doubtful that the heat from the flames would have caused the doors

to expand. However, the cook did not know whether she was the last person to enter the premises that evening, and further she testified that people attempting to lock the doors experienced some difficulty in so doing.

That the conclusion of the Fire Department was that the cause of the fire was "unknown" and that the State Police Crime Laboratory conducted ultra-violet ray tests in the rectory office designed to detect the presence of a petroleum base, the results of which were negative. But Chief Dovgala testified that evidence of arson is usually destroyed in the fire itself and that the firemen are their own worst enemies in this connection, since in extinguishing the fire the evidence may be washed away. A million gallons of water were used to extinguish the blaze in the instant case.

That the attendant at the gasoline station at the time when Lucas claimed to have purchased the gasoline testified for the defense that he had not sold gasoline to any person on foot during the night of the fire. On cross-examination he admitted that while he had probably sold gasoline to persons on foot on many occasions, he could not recall a single specific night on which he sold gasoline to any one on foot. He further admitted that it is contrary both to local ordinance and his employer's policy to sell gasoline in a bottle, and that he would probably lose his job if he did so sell it.

That the police during their investigation did not attempt to confirm Lucas' account of his walk down Perry Street and his stop at the bus terminal for a drink of water. Janet Cassidy, the night ticket agent at the terminal, testified that Lucas, whom she knew on sight, did not enter the terminal on the night of the fire, and that the doors were locked between 3:30 and 5:00 A. M. in order for the terminal to be cleaned. From her station she had an unobstructed view of the drinking fountain. On cross-examination Mrs. Cassidy admitted that she napped occasionally while she was on the job, but she insisted that she remained awake on the night of the fire. It should be noted that Lester Meeks,

the terminal policeman, testified for the State on rebuttal that Mrs. Cassidy did take naps and that on occasion it was difficult to wake her up. After Meeks left for the night, at approximately 4:00 A. M., he would lock up two of the doors to the terminal, but the back door was left open. Pursuant to company policy the janitor must lock the other door after Meeks' departure. However, Meeks did not know whether this procedure was followed on March 14.

That Father Basco called by the defense testified that he had never given religious instruction to Lucas, although he had been the pastor of the only Catholic parish in Florence from 1939 to the date of trial, with the exception of one year.

That although the police inquired, none of the priests at the Cathedral remembered having an altercation with Lucas.

That it was further established that Lucas was not registered, as he claimed in his confession, at the Hotel Penn on the night of the fire.

In summary, the core of the State's case on corroboration is that the facts recited in Lucas' confession could only have been known by the one who set the fire. Nowhere in the record is there evidence tending to explain, consistent with the hypothesis of innocence, how Lucas acquired the incriminating information which he recited to the police. At best, the proof tending to negate the crucial facts in the confession were circumstantial, leading to inconclusive inferences. The proofs tending to negate the peripheral facts recited in the confession, such as where Lucas resided on the night of the fire, whether he had had previous religious training in Catholicism, whether Lucas entered the bus terminal for a drink of water, even if accepted as true, were not in their totality sufficient as a matter of law to warrant the conclusion that the confession was untrustworthy.

Giving due consideration to the points raised by defendant to evince a negation to the truth of the confession, still there existed at the conclusion of the State's case and the entire trial a factual situation for the determination of the jury as to its trustworthiness.

■ On motion to direct an acquittal on grounds of lack of corroboration the trial court must determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy. See *State v. Dunphy*, 24 *N. J.* 10, 16 (1957); *State v. Kollarik*, 22 *N. J.* 558, 564 (1956); *State v. Rogers*, 19 *N. J.* 218, 232 (1955). As we have indicated, the test has clearly been met and the trial court was correct in refusing to direct a judgment of acquittal on grounds of failure of corroboration both at the conclusion of the State's case and at the conclusion of the entire case.

On the question of corroboration, the court charged defendant's request to charge number 29 as follows:

"The *corpus delicti*, in order to corroborate the confession, must be proved by evidence other than the confession, beyond a reasonable doubt."

No further request to charge on the subject of corroboration was made.

■ It should be noted that the charge placed a greater burden on the State than the law requires and was in that sense favorable to the defendant. The corroborative proofs need only establish the trustworthiness of the confession and not the *corpus delicti*.

Defendant argues that, although no charge on the subject was requested, the trial court should have defined the term *corpus delicti*.

■■ We do not find that the court's failure to specifically charge the jury with respect to their duty to find corroboration within the standards outlined in this opinion constituted plain error, pursuant to *R. R.* 1:5–1(*a*) which, as defined in *State v. Corby*, 28 *N. J.* 106, 108 (1958), means "legal impropriety affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.

*State v. Haines,* 18 *N. J.* 550, 565 (1955) ; *State v. Picciotti,* 12 *N. J.* 205, 211 (1953)." The entire thrust of the defense, aside from insanity, was to establish that the facts recited in the confession were untrue. The court charged defendant's request number 18 as follows:

"It is for the Jury to decide whether the Defendant spoke the truth when he confessed, if he did confess, and whether the witnesses who testified that he made such a confession testified truthfully."

And in the main body of the charge the court declared that the weight and credibility to be given to the confession were for the jury to determine after a consideration of all the evidence in the case. The jury, in weighing the confession, and assaying its truth, must have considered the state of the independent corroborative proofs. In light of all of the foregoing we are not convinced that the failure to specifically charge on the subject of corroboration of the confession possessed a clear capacity to bring about an unjust result.

## II.

### THE DEFENSE OF INSANITY.

Psychiatric testimony was proffered at two separate points in the trial. First, without the presence of the jury, in order for the trial court to determine whether the confession was admissible in evidence, and secondly, in the presence of the jury on the issue of insanity at the time of commission of the crime and at the time the defendant confessed.

▪▪ Without detailing the psychiatric testimony taken without the presence of the jury, ·we are satisfied from a study of the record that the trial court was correct in ruling that the confession was admissible.

On the issue of insanity at the time of commission of the offense, Dr. Robert R. Bennett, psychiatrist and Medical Director of the Trenton State Hospital, testified on behalf of the defense. He first examined Lucas three days after his admission to the hospital, and thereafter examined him

between 15 to 20 times. On the first examination Dr. Bennett found that Lucas, who was lying in bed, was "not moving, apparently not paying too much attention to his surroundings. When spoken to, after a few moments, he would reply. His reply, for the most part, would be very brief, usually in just a monosyllable, he knew where he was, he knew the approximate date and year." It was "like pulling teeth" to get information from him. Emotionally he was "very flat," *i. e.*, he had little or no emotional reaction. Lucas told Dr. Bennett that he had a hallucination on one occasion, two or three years prior, in that he heard God's voice speak to him. Dr. Bennett's diagnosis was "schizophrenia reaction, simple type." Lucas' treatment in the hospital consisted of a series of electric shock treatments and a tranquillizing drug, thorazine. On March 3, 1958 he was discharged from the hospital with no overt signs of psychosis.

Dr. Bennett was not asked whether Lucas knew the difference between right and wrong or whether he knew the nature and quality of his acts.

Dr. Abraham Ornsteen, a prominent specialist in neurology and psychiatry, testified that he examined Lucas at the Trenton State Hospital on August 20, 1957 for approximately two hours. Dr. Ornsteen found Lucas suffering from a "two-fold" condition: "basic mental retardation which is congenital, and a mental disease known as schizophrenia." Schizophrenia, according to Dr. Ornsteen, "means a pathological splitting of his personality. In terms of disassociating, splitting of his understanding of his life's situations and the total life situation in which he was brought up, and what is [sic] his present predicament is, Schizo means split, and phrenic means mind, and everything I observed, from my observations and interpretation of the things that I gathered from the examination, the psychiatric examination, that this man was mentally ill at that time." He found Lucas to be suffering from "a very marked speech disability." His articulation and enunciation were distorted, making him difficult to understand. Lucas showed evidence

of being mentally confused, having "very limited understanding of the over-all situation at the time in which he was involved and affected." His "insight" "was very limited and restricted to a puerile level. [T]hat is the level of a child who knows facts, can repeat what he is told" but cannot evaluate the "over-all import of his predicament." Dr. Ornsteen opined that the schizophrenia which is "not an acute process, but a slowly developing, deeply ingrained abnormal or pathological condition of the brain functioning" from which Lucas suffered, existed on March 14, 1956 "and for a long time before that." The doctor was asked:

"And, sir, do you have an opinion as to whether or not this subject knew the difference between right and wrong on March 14, 1956? A. Insofar as it pertained to an act, an anti-social act, which was based on his mental illness and psychopathic thinking; he could not differentiate between right and wrong."

On cross-examination the prosecutor sought to impeach the doctor's testimony with respect to whether Lucas could distinguish between right and wrong by referring to his testimony taken previously in the trial without the presence of the jury. At that time the doctor had stated that Lucas had the capacity to distinguish between right and wrong on a theoretical level, i. e., that because of his religious training he knew the difference between right and wrong in the same manner "as a child understands his numbers as taught in the first grade," but that he was unable to control his behavior when driven to certain acts by reason of his mental illness. "At those times his conception of right and wrong differentiations are not available to him. He doesn't have the freedom of choice."

Dr. Ivan Bird, a psychiatrist, testified that he had had occasion to examine Lucas twice in 1954 and also examined him at the request of defense counsel twice in April of 1958. On the occasion of his examination in 1958 he found Lucas "willing to talk," although his speech at times was a little difficult to understand. His findings were that Lucas was

"suffering from a personality defect of a schizophrenic type. That is a classification of a type of personality reaction that we recognize in psychiatry. I found him to be rather simple and sort of childish or puerile in his responses. I did not find that he was actively mentally ill at the particular time I examined him in April, the two times that I examined him." In 1954 his findings were inconclusive. He felt that Lucas was "possibly a mental defective." He was "simple in his reactions, rather indifferent, barely able to answer questions with insight or judgment * * *" In 1954 the doctor "was unable to develop whether Lucas was a mental defective or another type of personality defect" because requisite psychological tests which he recommended were not conducted. Again Dr. Bird was not asked a question framed in the familiar M'Naghten language.

Dr. James B. Spradley, a psychiatrist with eminent qualifications, testified for the State. Dr. Spradley first observed and examined Lucas during the period of his interrogation by the police on December 19, 1956. At that time he saw no evidence of mental confusion or aberration of a degree which would in any way prevent him from giving correct answers to the questions which were posed to him. As a result of his examination Dr. Spradley was of the opinion that Lucas was of a low average mentality, but not a mental defective. The doctor stated that Lucas was a psychopathic personality, which he defined as a "social misfit." It was his conclusion that Lucas "was not insane at that time. That he knew what he was doing. That he knew the consequence of what he was doing." "I recognized him as a sex deviate, a so-called sex pervert, and, according to his own admission, he was a pyromaniac. That was the result of my study of him."

On January 2, 1957, Dr. Spradley again examined Lucas at the Mercer County Jail. At that time he noticed a change in his reactions: he was frightened, not as talkative as before; more reticent to answer questions, and vacillated as to whether he was or wasn't guilty. He felt that Lucas

was going to develop some acute type of psychosis, although he did not know what form it would take. He could have become acutely depressed and suicidal. In order to prevent the onslaught of acute mental illness, or if such did develop to shorten the duration and severity of the attack, he recommended that Lucas be sent to the State Hospital for treatment and signed the papers for his commitment. Dr. Spradley was of the opinion that Lucas had the ability to distinguish right from wrong on March 14, 1956, and also on January 2, 1957, despite the change in his condition on that date.

It is apparent that from the evidence adduced the jury could find, as they did, that the defendant was legally sane under the M'Naghten rule at the time of the commission of the act. Counsel for the defense submitted six requests to charge on the issue of insanity, not in the alternative, setting forth various tests for determining criminal responsibility. Request number 34 was framed in the familiar M'Naghten terminology:

"To establish a defense on the grounds of insanity, it must be clearly proven that, at the time of the committing of the act, the party accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing or if he did know it, that he did not know that he was doing what was wrong."

The trial court denied the request on the grounds that he had already so charged, as indeed he had. The court charged:

"To establish a defense on the ground of insanity, it must be proved that at the time of committing the act the accused was laboring under such a defect of reason as not to know the nature and the quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong."

Requests to charge numbers 33, 36, 37, 39 and 40, which were denied, appear to be variations and amalgamations of the M'Naghten, Durham (*Durham v. United States*, 94 *U. S. App. D. C.* 228, 214 *F. 2d* 862, 45 *A. L. R. 2d* 1430

(*D. C. Cir.* 1954)) and irresistible impulse tests of criminal responsibility.

The defendant presently urges that the M'Naghten rule should not be continued as the rule in New Jersey. Because of our desire to dispose of that question on its merits, particularly in view of the serious consequences of the offense charged, we bypass the arguments of the State that the question is not properly raised (a) ˙ because there is no foundation in the evidence for a finding of insanity on any of the other tests of criminal responsibility, and (b) that denial of inconsistent requests to charge not framed in the alternative cannot form the basis for error on appeal.

 The M'Naghten rule, that at the time of the committing of the act, the party accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong, was first adopted in this State in 1846 in *State v. Spencer,* 21 *N. J. L.* 196 (*O. & T.* 1846). It has been periodically attacked as unsound or archaic for six decades, but the New Jersey courts have adhered to the rule. *Genz v. State,* 59 *N. J. L.* 488 (*E. & A.* 1896); *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926); *State v. George,* 108 *N. J. L.* 508 (*E. & A.* 1932); *State v. Cordasco,* 2 *N. J.* 189 (1949). See *State v. White, infra; State v. Gibson,* 15 *N. J.* 384 (1954); *State v. Huff,* 14 *N. J.* 240, 250 (1954).

Mr. Justice Wachenfeld in *Cordasco* met the challenge as follows:

"The rule condemned by many as ancient nevertheless seems to give as great a measure of protection and security to society as the exigencies and complexities of present-day circumstances will permit.

We concur in the rule as presently inscribed in our cases, not because we are restricted by precedent but by reason of our consciousness of the depth of a most difficult problem and the possible serious consequences flowing therefrom. The standard which appellant urges for acceptance in place of that heretofore uniformly followed has not been sufficiently defined for practical application and

might open the door to the evasion of criminal responsibility so as to transcend and threaten the public interest which our laws seek to protect." (2 *N. J.,* at *page* 198)

Since the *Cordasco* case has come the renowned opinion of Judge Bazelon in *Durham v. United States,* 94 *U. S. App. D. C.* 228, 214 *F. 2d* 862, 45 *A. L. R. 2d* 1430 (*D. C. Cir.* 1954), which follows closely the New Hampshire test of criminal responsibility enunciated in *State v. Pike,* 49 *N. H.* 399 (*Sup. Ct.* 1869). The Durham test "is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." 214 *F. 2d,* at *pages* 874–875.

Following *Durham* there has been a flood of literature on the issue of criminal responsibility. The critics of the M'Naghten rule were revitalized by the fact that New Hampshire was joined by the District of Columbia. The Durham test has thus far been singularly unsuccessful in winning adherents. It has recently been rejected in the following cases: *People v. Ryan,* 140 *Cal. App. 2d* 412, 295 *P. 2d* 496 (*Sup. Ct.* 1956); *People v. Carpenter,* 11 *Ill. 2d* 60, 142 *N. E. 2d* 11 (*Sup. Ct.* 1957); *State v. Goza,* 317 *S. W. 2d* 609 (*Mo. Sup. Ct.* 1958); *Flowers v. State,* 236 *Ind.* 151, 139 *N. E. 2d* 185 (*Sup. Ct.* 1956); *Commonwealth v. Chester,* 150 *N. E. 2d* 914 (*Mass. Sup. Jud. Ct.* 1958); *Sollars v. State,* 73 *Nev.* 248, 316 *P. 2d* 917, rehearing denied 73 *Nev.* 343, 319 *P. 2d* 139 (*Sup. Ct.* 1957); *State v. Goyet,* 120 *Vt.* 12, 132 *A. 2d* 623 (*Sup. Ct.* 1957); *State v. Collins,* 50 *Wash. 2d* 740, 314 *P. 2d* 660 (*Sup. Ct.* 1957); *Bryant v. State,* 207 *Md.* 565, 115 *A. 2d* 502 (*Ct. App.* 1955). Quite recently Pennsylvania, in a strong opinion, reaffirmed its adherence to M'Naghten, *Commonwealth v. Novak,* 395 *Pa.* 199, 150 *A. 2d* 102 (*Sup. Ct.,* March 16, 1959, rehearing denied April 27, 1959). *Cf. Howard v. United States,* 232 *F. 2d* 274 (5 *Cir.* 1956); *Andersen v. United States,* 237 *F. 2d* 118 (9 *Cir.* 1956); *Sauer v. United States,* 241 *F. 2d* 640 (9 *Cir.* 1957), *certiorari* denied 354 *U. S.* 940, 77 *S. Ct.* 1405, 1 *L. Ed. 2d* 1539 (1957).

In *Andersen v. United States, supra,* the court held that it was bound by the decision of the United States Supreme Court in *Davis v. United States,* 160 *U. S.* 469, 16 *S. Ct.* 353, 40 *L. Ed.* 499 (1895), and *Fisher v. United States,* 328 *U. S.* 463, 66 *S. Ct.* 1318, 90 *L. Ed.* 1382 (1946), and therefore could not follow *Durham,* but further indicated that it had:

"* * * no desire to join the courts of New Hampshire and the District of Columbia in their 'magnificent isolation' of rebellion against M'Naghten, even though New Hampshire has been traveling down that lonesome road since 1870. See *State v. Pike,* 49 *N. H.* 399. Rather than stumble along with *Pike,* we prefer to trudge along the now well-traveled pike blazed more than a century ago by M'Naghten." (237 *F.* 2d 118, at *page* 127.)

We are not yet ready to assume that those who have cognition of the nature and quality of a criminal act, *i. e.,* who have sufficient contact with reality to know the consequences of such an act, or who have the mental capacity to distinguish right from wrong, should nonetheless be held unaccountable because the act was the "product" of "mental disease or mental defect."

First, what is a product? Obviously the term connotes some type of causation. One noted psychiatrist has recently suggested that there is an identity between mental illness and criminal behavior in the following language:

"Mental illness does not cause one to commit a crime nor does mental illness produce a crime. Behavior and mental illness are inseparable—one and the same thing." Roche *"Criminality and Mental Illness—Two Faces of the Same Coin,"* 22 *U. of Ohio L. Rev.* 320, 322 (1955).

Another author has suggested:

"* * * moreover, the average psychiatrist's attitude toward criminal behavior seems to embody, as basic assumption, that such behavior is *prima facie* evidence of mental disease. It can, therefore, be expected that few psychiatrists will hesitate to find the necessary causal connection between the crime and the disease, once they have

determined the disease to exist, knowing a crime has been committed." *De Grazia, "The Distinction of Being Mad,"* 22 *U. of Ohio L. Rev.* 339, 343 (1955).

If it is true that, from a psychiatric viewpoint, anti-social behavior either evidences or equals mental disease or defect, then the Durham test comes perilously close to suggesting that proof of the commission of a crime is also *prima facie* evidence of the legal irresponsibility of the accused.

What of "mental disease" or "defect" as employed in the Durham test? Is, for instance, the diagnostic label "psychopathy" a mental disease or defect? See *Note,* 10 *Rutgers L. Rev.* 425 (1955). If the question of what is a mental disease or defect is a psychiatric one, then the law has abdicated its function of determining criminal responsibility to the psychiatrist and the jury will have to accept the unopposed psychiatric view of mental disease or defect. The test will differ with the prevailing psychiatric winds of the moment. Professor Hall has recently cautioned:

"The lawyer pondering the attacks of the psychiatrist critics might also consider the meaningful case of 'irresistible impulse.' He would discover that only a short time ago that concept was emphatically presented as an example of the 'uniform' opinion of psychiatrists on criminal responsibility; and yet today 'irresistible impulse' is rejected by most psychiatrists as unsound! At this point, the inquiring lawyer might well conclude that psychiatric knowledge is far from being indisputable, and that to reach a sound conclusion of his own he must do something more than choose among the experts." *Hall, "Psychiatry and Criminal Responsibility,"* 65 *Yale L. J.* 761, 762 (1956).

If, on the other hand, mental disease or defect are legal terms and the jury is free to disregard the unopposed psychiatric evidence, and substitute therefor their own definition of mental disease or defect, what standards have they to guide them? In our view the Durham test is not an improvement over M'Naghten. At its worst it absolves from criminal responsibility too large a segment of those who transgress the law than society can permit if it is to

preserve social order. At best it is nebulous, leaving the jury to grope about for the relevant facts upon which to base a sensible decision that the accused should or should not bear the responsibility for his act. See *Hall, supra,* 65 *Yale L. J.,* at *pp.* 770–771.

 Until such time as we are convinced by a firm foundation in scientific fact that a test for criminal responsibility other than M'Naghten will serve the basic end of our criminal jurisprudence, *i. e.,* the protection of society from grievous anti-social acts, we shall adhere to it. As Professor Hall has aptly observed:

"* * * Legal controls cannot be abandoned in response to the alleged findings of current science until it is ascertained whether the scientific knowledge necessary for effective operation of the new laws is actually available."

We further find no considered improvement over M'Naghten, and therefore refuse to adopt, either the irresistible impulse test adopted by a minority of jurisdictions as an embellishment or complement to M'Naghten, or the Model Penal Code's modifications of the M'Naghten rule. See *A. L. I., Model Penal Code,* § 4.01 *(Tent. Draft No. 4, 1955).*

### III.

#### Failure of Court to Conduct an Inquiry Into Defendant's Ability to Stand Trial.

The defendant contends that the court erred in failing, on its own motion, to embark upon a collateral inquiry into Lucas' mental capacity to stand trial.

 A defendant whose mental condition is such that he is unable to comprehend his position, to consult intelligently with counsel and plan his defense, cannot be put to trial. *State v. Peacock,* 50 *N. J. L.* 34 *(Sup. Ct.* 1887), reversed on other grounds, 50 *N. J. L.* 653 *(E. & A.* 1888); *State v. Noel,* 102 *N. J. L.* 659 *(E. & A.* 1926); *State v.*

*Auld,* 2 *N. J.* 426 (1949) ; *State v. Gibson,* 15 *N. J.* 384 (1954) ; *State v. Konigsberg,* 44 *N. J. Super.* 281 (*App. Div.* 1957).

*N. J. S.* 2A:163–2 authorizes the trial judge to conduct a hearing in advance of trial to determine the sanity of the accused at that time upon application by counsel.

But our case law has also prescribed that such an inquiry may be made during the course of the trial on motion of either the court or counsel. In *State v. Peacock, supra,* Mr. Justice Reed held:

"It is undoubtedly the law that a person who by reason of insanity is unable to comprehend his position, and to make his defense, cannot be placed upon trial for a crime. If the court either before or during the progress of such a trial, either from observation or upon the suggestion of counsel, have facts brought to its attention which raises a doubt of the condition of defendant's mind in this respect, the question should be settled before another step is taken. The method of settling this preliminary question, where it is not the subject of statutory regulation, is within the discretion of the trial court. The court can itself enter upon the inquiry, or submit the question to another jury empaneled for that purpose." (50 *N. J. L.,* at *page* 36)

And in *State v. Auld, supra,* Mr. Justice Oliphant declared for this court:

"If the condition of a defendant's mind is brought into question in this respect at the time of pleading or at trial, either from observation or at the suggestion of counsel, the question should be immediately settled. The court can itself enter upon the inquiry or submit the question to another jury impaneled for that purpose. *State v. Peacock,* 50 *N. J. L.* 34 (*Sup. Ct.* 1887), reversed on other grounds, 50 *N. J. L.* 653 (*E. & A.* 1888) ; *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926)." (2 *N. J.,* at *page* 435)

This language was quoted with approval in *State v. Gibson, supra;* but *cf. State v. Walker,* 15 *N. J.* 485, 494 (1954). But while the court has the power to order an inquiry in the defendant's mental qualifications to stand trial, failure to exercise the powers will not be reviewed on appeal, unless it clearly and convincingly appears that the defend-

ant was incapable of standing trial. It is to be ordinarily expected that defense counsel, who is in a far better position than the trial judge to assay the salient facts concerning the defendant's ability to stand trial and assist in his own defense, would originate the request that such an inquiry be conducted.

█ In the instant case the trial judge did not err in failing to halt the trial and, on his own motion, engage in a collateral inquiry into the issue of the defendant's mental qualifications to stand trial. The only hint in the record on this score was the testimony of Dr. Ornsteen, who testified in response to a question on cross-examination during the inquiry as to the admissibility of the confession without the presence of the jury, as follows:

"Now, sir, do you think he is mentally competent at this time to consult with his attorneys in the preparation of his defense? A. Incompetent in preparation. He can confer with him but unreliably, because he doesn't have the depth of understanding. He doesn't have the insight of abstract values. Certainly, he can confer but not to his advantage."

On the other hand, Dr. Larsen, a psychiatrist at the Trenton State Hospital testifying for the defense on inquiry as to the admissibility of the confession, stated that upon his release from the State Hospital on March 3, 1958 Lucas was free of psychosis.

Dr. Bennett, testifying for the defense, confirmed this fact and further stated that Lucas at the time of his release:

"* * * appeared to have gone into a good state or remission, and we felt he was capable of consulting with his counsel in his own defense, and able to return to court and face the charge that had been lodged against him."

From these proofs we cannot conclude that the trial court was under any duty to conduct a collateral inquiry into the defendant's ability to stand trial.

## IV.

### Charge Regarding the Elements of the Crime.

The defendant asserts that the trial court failed to define the basic elements of the crime, citing *State v. Butler*, 27 *N. J.* 560 (1958). The arson referred to in *N. J. S.* 2A:113–1 and 2 is the common law and not the statutory crime. *State v. Butler, supra.* Common law arson is the willful and malicious burning of the dwelling house of another, *State v. Fish*, 27 *N. J. L.* 323, 324 (*Sup. Ct.* 1859); *State v. Midgeley*, 15 *N. J.* 574, 576–577 (1954).

The trial court charged in a modified form (the modification did not concern the elements of arson set forth in the request) defendant's request to charge number 28:

"In order to establish its case the State must prove burning by willful act of the Defendant. A single fact that a building has been burned does not prove arson."

Other references to arson were:

"[Defendant] is specifically charged with the unlawful burning of the Rectory * * * causing * * * death * * *.

[Defendant's defense is divided into two parts] the first part is that he is not guilty of the offense * * * 'that is, he denies that he set fire to the rectory * * *'

The second part is that if you find beyond a reasonable doubt that he did 'fire the rectory,' then he was insane at the time he set the fire. * * *

[Defendant] disputes the accusation and the proof that he set fire to the rectory * * *.

[You must] resolve * * * whether * * * he did * * * set fire to the rectory.

The State contends that on March 14, 1956, the Defendant, Elber Lucas set fire to the Rectory. * * *

* * * * * * * *

The resultant fire ignited a goodly portion of the Rectory occupied as an administrative office and a dwelling * * *."

Thus, the jury were told that they must find from the evidence that the defendant set fire to the rectory which

was used as a dwelling beyond a reasonable doubt, and further, that the State must prove that it was a willful act and that the fact that the building was burned does not prove arson.

It is true that the court did not specifically state that arson consists of the burning of the dwelling house of another, and the specific element of "maliciousness" was not charged. But it cannot be said that this failure constituted plain error. No question is raised regarding the fact that the rectory was a dwelling, and indeed, there are ample proofs in the record to establish that it was.

While under the *Butler* case the trial court may be under an obligation to charge the fundamental elements of the crime, failure to do so will not result in reversible error where, from the context of the entire case, it is apparent that the jury could not have been ignorant of or confused or misled regarding "the legal implements to reach and form a verdict."

## V.

### CHARGE RELATING TO LIFE IMPRISONMENT.

At 9:20 P. M., on May 22, 1958, the jury retired to deliberate upon its verdict. At 11:00 P. M. they returned to the courtroom where the following ensued:

"The Court: Members of the jury, I have a note from you which reads: 'Your Honor'—question number one: 'What is a life sentence in New Jersey?'

Question number two: 'The question of a life sentence has arisen and we would like to know when the defendant would be eligible for parole.'

Signed: 'The Jury.'

Is that your question, Mr. Foreman?

Mr. Foreman: Yes, sir.

The Court: I will instruct the jury that if you bring in a verdict of guilty of murder in the first degree with a recommendation of life imprisonment, the Court must sentence the defendant to life imprisonment.

With regard to the power of the New Jersey State Parole Board, I will read you the statute.

Revised Statute, titled '30:4–123.11' and I quote from that statute:

'Any prisoner serving a sentence of life shall be eligible for consideration for release on parole after having served twenty five years of his sentence, less computation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments.'

Of course, in your continued deliberation you will consider all of my charge as heretofore made.

The jury may now retire."

No objection was made to this charge by the defense. The jury again retired to the jury room for further deliberation at 11:05 p. m. At 12:15 a. m., on May 23, 1958, they returned to the courtroom, having agreed upon a verdict. Three days later, on May 26, 1958, this court decided *State v. White*, 27 *N. J.* 158 (1958). There can be no doubt that the charge here in question is not compatible when measured against the model charge set forth by Mr. Chief Justice Weintraub in the *White* case, to be given upon inquiry of the jury concerning the meaning of a sentence of life imprisonment. The question is: Is it plain error within the context of the present case? We are of the opinion that it is not. In *White* Mr. Chief Justice Weintraub commented on the core of the problem in addressing the argument that the charge given was not harmful, as follows:

"We cannot agree the error is harmless, for if a jury, doubtful as to whether the penalty should be death or satisfied that it should be life imprisonment, should withhold a recommendation because the death sentence may be commuted or because another agency may grant parole on a life sentence, it is difficult to comprehend how it can be maintained that there is no harm to a defendant." (27 *N. J.*, at *page* 177)

Here the jury did not withhold a recommendation of life imprisonment, so that the charge, even if erroneous, was not prejudicial to the defendant in the final analysis.

But the defendant argues, here the jury was not deliberating on the question of life or death, but on the question of acquittal or life imprisonment. The argument is

too speculative. We have no appellate yardstick to gauge the state of the proofs in order to determine whether the jury, in inquiring as to the meaning of life imprisonment, was at that time deliberating between life imprisonment and acquittal. The only legitimate inference from the inquiry is that the jury is at least considering a recommendation of mercy. Where, after an erroneous charge, they return with a verdict of guilty without recommendation, the further inference can be drawn that the error may have helped sway them towards the harsher verdict. But where, as here, they return with recommendation of life imprisonment, the probability is just as great, if not greater, that the erroneous instruction did not operate to dissuade them from a recommendation than it is that it operated to persuade them that an acquittal should not be had.

What is even more important, the defendant's argument rests on the underlying premise that the jury, if they believed that a sentence of life imprisonment really meant life imprisonment, would have acquitted the defendant. The *White* model charge was intended to change the type of charge here given by the addition of statutory language indicating that parole is not automatic. To that extent the charge here was more beneficial to defendant's thesis than that in *White*.

## VI.

### RESTRICTION ON EXPERT PSYCHIATRIST FROM TESTIFYING AS TO HEARSAY STATEMENTS OF THE DEFENDANT.

On two occasions Dr. Ornsteen attempted to testify as to various statements made to him by the defendant. The prosecutor's objection that the testimony was hearsay and not admissible because the doctor was not a treating physician was sustained by the court. This was an undue restriction on the scope of the doctor's testimony. Generally such statements are not hearsay because they are not offered

as proof of the facts asserted, but merely as circumstantial indications of the state of mind (insanity) of the accused as a foundation for the doctor's findings. See 2 *Wigmore, supra*, § 228, *p*. 14; 6 *Wigmore, supra*, § 1790. The rationale of the non-hearsay aspects of such testimony is that one of the main sources of proof of insanity is the conduct of the person. In this connection verbal conduct is as important as non-verbal in the psychiatrist's view. The psychiatrist is not so interested in the truth of what is said as he is in the fact it was said. Witness the classic illustration of a man who claims that he is Napoleon. Such statements are evidence of irrationality. See *McCormick, supra*, § 288, at *pp*. 467–468.

However, the error was not prejudicial. An examination of Dr. Ornsteen's subsequent testimony reveals the ruling did not impede the doctor's ability to fully and adequately convey his diagnostic impressions and opinions.

It should be noted that there may be instances in which statements made by the accused to the psychiatrist might also relate to the guilt or innocence of the accused. In the instant case, for instance, Dr. Ornsteen did testify fully without the presence of the jury concerning statements made to him by the defendant. Among these was the statement that Lucas denied guilt of the crime. In such instances the introduction of the testimony is permissible where the psychiatrist asserts that it constituted a necessary element in the formulation of his opinion. In that event, the testimony should be circumscribed by an appropriate limiting charge by the trial court to the effect that it should not be considered by the jury as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the psychiatrist on the question of insanity. If it further appears that the psychiatrist's opinion hinges upon the truth of the matter asserted, rather than the fact that it was said, then the jury should be instructed that the probative value of the psychiatrist's

opinion will depend upon whether there is, from all the evidence in the case, independent proof of the statement made by the accused.

## VII.

1. Defendant contends that the verdict was against the weight of the evidence. The rule is that

"* * * A verdict of a jury shall not be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." (*R. R.* 1:5-1(*a*))

 As stated by Chief Justice Vanderbilt in *State v. Haines,* 18 *N. J.* 550, at *pages* 565–566 (1955):

"The responsibility for determining whether guilt of the defendant has been proven beyond a reasonable doubt rests with the jury, and our review upon appeal is aimed only at correcting injustice resulting from obvious failure by the jury to perform its function. * * * Unless there is an indication that the verdict was the result of mistake, partiality, prejudice or passion on the part of the jury it ought not be disturbed by us."

 In the light of the entire evidence, including the independent proof corroborating the trustworthiness of the confession, the defendant's confession and numerous oral admissions against interest and the inference which the jury could legitimately draw from the defendant's failure to testify, the contention that the verdict was against the weight of the evidence is without merit.

 2. It is further asserted that there was error in the trial court's charge concerning the defendant's failure to testify. The court charged:

"Under our law where evidence brought against a defendant tends to establish facts which, if true, would justify or tend to justify a conviction and the defendant is in court and is in a position to deny such evidence of his own knowledge, and if he fails to take the stand in his own behalf, then his silence will justify a strong inference that he could not deny such evidence. This rule applies to

evidence which is direct and which the defendant is in a position to deny.

It does not apply to such evidence as may be circumstantial, only raising an inference of guilt, and which the defendant is not in a position to deny of his own knowledge."

Under the circumstances of this case, the charge fully accords with the views set forth in the recent case of *State v. Corby,* 28 *N. J.* 106 (1958).

3. The defendant argues that the trial court committed error in failing to charge certain requests to charge relating to circumstantial evidence and predicated upon language in *State v. Donahue,* 2 *N. J.* 381, at *pages* 390, 391 (1949). *Cf. State v. Dancyger,* 29 *N. J.* 76 (1959). While we do not comment on the merits of the *Donahue* rule under the circumstances of that case, the rule is clearly inapplicable where, as here, the evidence adduced by the State in support of its theory is not "largely circumstantial." Defendant's confession and oral admissions against interest were direct evidence of his guilt.

4. We further find no merit in defendant's contention that the trial court's charge on insanity was confusing or unfair, or that defendant was denied a fair trial or deprived of due process of law. It should be noted that there is nothing in the record to indicate that the confession was involuntary or that the defendant was abused by the police during the period of his interrogation.

We note that many of the points of error alleged were raised for the first time on this appeal. Apparently they were not evaluated as giving rise to fundamental unfairness at the time of the trial.

All points raised by the defendant have been examined and those not specifically alluded to herein we find to be without merit.

The defendant has received a fair trial surrounded by all of the substantive and procedural safeguards afforded by our system of criminal justice. He was ably represented by three competent counsel. The ultimate question of guilt

or innocence was clearly one for the jury to resolve from the evidence adduced and we can find no error in the proceedings calling for a reversal of its verdict.

The motion of the State (M–108, September Term 1958) to supplement the record is denied and the affidavit submitted was not considered in the disposition of this cause.

The judgment appealed from is affirmed.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice BURLING but I follow a different route in concluding that the *M'Naghten rule* should not be abandoned.

Whether *M'Naghten* is sound depends upon the starting point one selects. *M'Naghten* presumably stemmed from the premise upon which our criminal law is based. The common law required the "concurrence of an evil-meaning mind with an evil-doing hand." *Morissette v. United States,* 342 *U. S.* 246, 251, 72 *S. Ct.* 240, 96 *L. Ed.* 288 (1952). In general terms, *mens rea* consisted of a sense of wrongdoing. It is not surprising, therefore, that the common law lawyer conceived legal insanity to be something which negated the mental ingredient of the crime, *i. e.,* an appreciation of the wrongfulness of the act.

The common law concept of criminal liability was doubtless "scientifically" determined. Men then, as now, had the urge to understand and to act reasonably upon the basis of what they comprehend. They thought it "just" to deal criminally with men who commit hostile acts with a sense of wrongdoing. It was a moral or ethical judgment distilled from the total circumstances of the times, including beliefs as to why men act as they do.

The pull from the common law *mens rea* has been in opposite directions. *Mens rea* has been abandoned with respect to certain statutory offenses, and in fact some writers describe the common law concept in somewhat watered terms which would require only an intentional doing of a forbidden act. On the other hand, critics of *M'Naghten* would heighten the required mental element. Their avenue is a broader

view of insanity as a "defense," but, as I see it, the attack in essence is upon the mental ingredient of crime, for although we deal with insanity as a defense, we do so for procedural purposes only, the State being permitted to proceed on the presumption of sanity while the defendant must carry the burden of persuasion on his denial of *mens rea* by reason of insanity.

No one will dispute that society must be protected from the insane as well as the sane. The area of disagreement is whether a civil or a criminal process should be employed when forbidden acts have been committed. If we could think of a conviction simply as a finding that the mortal in question has demonstrated his capacity for anti-social conduct, most of the battle would be decided. What would remain is the employment of such post-conviction techniques as would redeem the offender if he can be redeemed and secure him if he cannot. The proposal before us, however, does not relate to post-conviction disposition but rather to the question whether the criminal process shall be invoked to adjudge a basis for deprivation of liberty. It is in that frame of reference that we are asked to abandon *M'Naghten* in favor of another concept of insanity which will excuse. I cannot subscribe to the proposal for a number of reasons.

The first is essentially negative—a rejection of the criticism that in retaining *M'Naghten* the law has improperly failed to keep abreast of psychiatric advances. The frame of reference, as I have said, is not the post-conviction disposition of an offender but rather his amenability to adjudication in the criminal process. So long as we have two processes which may be employed to deal custodially with anti-social conduct, one criminal and the other civil, the test for their application must be the existence or non-existence of blameworthiness in a personal sense. Here, I believe, there is an irreconcilable conflict between the present thesis of the criminal law and the thesis I find implicit in the psychiatric view of man. Our social order accepts a postulate, held in

varying degrees by most citizens and buttressed by religious tenet, that every man is endowed with the capacity to choose a correct course of behavior so long as he is able to detect it. In separating the sick from the bad, we start with the indisputable ability of man to adhere to the right. Upon that assumption, *M'Naghten* is unassailable. On the other hand, the psychiatric approach inevitably challenges this basis for a finding of personal blameworthiness. Psychiatry does recognize the existence of a volitional apparatus, but conceives it to be inseparably integrated with the intellect and the emotions. From its objective view, no man can be said (or shown) to have selected the dimensions of these faculties and hence to be the author of the inadequacy of any of them. Indeed, the unconscious is deemed to mock and play havoc with the conscious. Upon that approach the sick and the wicked would be equally free of blame in a personal sense. There could be no denominator which in terms of justice to the individual would differentiate one from the other. Hence the thrust of the psychiatric thesis would be to discard all concepts of insanity as a *defense,* be it *M'Naghten, Durham* or some other, and to deal with all transgressors as unfortunate mortals.

It is not my purpose here to choose between these conflicting theses. Rather my point is that they move in opposite directions and hence a conglomeration of the two will not solve the riddle of what is "just" to the individual. Man may one day obtain a better glimpse of himself, but until a basis for personal blameworthiness can be scientifically demonstrated, I would not tinker with the existing law of criminal accountability. Rather I would permit the scientist's growing knowledge of human behavior to have a wider sway in the area in which it can safely be utilized with evident fairness to society and to the individual. I refer to the post-conviction disposition of the offender. In essence, that is the course the Legislature followed in adopting the sex offender statute. There it did not provide that a pattern of repetitive, compulsive behavior shall be a

defense, but rather made it a factor in the determination of whether the convicted offender shall be placed in custody for treatment or shall be confined in a penal institution. *N. J. S. 2A*:164–5 *et seq.*

The second reason why I can not adopt another concept of insanity follows hard upon what I have already said. It is the vagueness of the doctrines proposed. I think they are vague and will remain vague (or arbitrary) until some one demonstrates a rational basis for a finding of personal blameworthiness and devises a test rooted to it. I gather that critics of *M'Naghten* would recognize a psychosis as the kind of illness which should excuse. But what of the neurotic or the psychopathic, to say nothing of the victims of other mental defects or disorders? What is a disease or defect of the mind? What, in terms appropriate to criminal responsibility, differentiates the functional aberration called a disease or defect of the mind from what is inscrutably called a defect of character? However helpful such classifications may be in the approach to the treatment of the sick, I cannot find in them a pivotal fact upon which criminal liability would depend, a key fact to which the trial and the jury's consideration could be addressed. I suspect that if psychiatrists were asked to fix a line, most would resort to an ethical or social concept, the truth of which they could not expertly demonstrate.

The third and most important reason is the inability of the judiciary to deal with the total problem. We all agree that society must be protected. If we are to excuse an offender from the criminal process because of insanity, there must be a civil process adequate for the area abandoned. I doubt that civil commitment could be ordered under existing statutes in all cases in which an acquittal would follow under *Durham* or some such doctrine. And if that hurdle could be overcome judicially, the problem of release would be formidable. The testimony in this case illustrates my point. A defense psychiatrist found Lucas to be schizophrenic and irreversibly so, but he added that whether Lucas

could live harmlessly within his fantasy of religion depended upon whether in fact he did set fires. If he did, then he should be confined; otherwise he was entitled to his freedom. Another expert, testifying for the State, was satisfied that Lucas was a psychopath, but on cross-examination agreed that whether he was a sexual deviate depended upon whether he did in fact deviate and that whether he was a pyromaniac depended upon whether he did in fact commit arson. That same witness had signed a commitment application based, I gather, not upon the underlying illness he found, but rather upon tensions which he detected and which he feared might erupt into a psychosis. Still further, while the defense psychiatrist mentioned above was certain that the psychosis was irreversible and degeneration would continue, yet the head of the mental institution, who found Lucas schizophrenic on admission, later discharged him as free of any overt sign of committable illness. All of these witnesses are men of imposing qualifications and I do not question the sincerity of their views, but I am not willing to let the security of society depend upon a science which can produce such conflicting estimates of probable human behavior. A release from custody would be something else if (1) it depended upon an affirmative medical opinion that a recurrence of illness is strongly negatived; (2) there were parole supervision; (3) there were a firm grip upon the man to the end that he could be returned to custody upon signs of possible recurrence without awaiting the commission of another anti-social act; and (4) the heads of mental institutions were oriented to the added responsibility which would be theirs. In my judgment, only the legislative and executive branches can provide the techniques which would be necessary if the judiciary ventured from its present view of criminal responsibility.

There is a further consideration, the weight of which would depend upon the course of events under an expansive view of insanity as a defense. Existing psychiatric facilities are inadequate for the present scene. It can hardly be denied

that much of our penal population suffers from mental disorders for which treatment cannot now be provided. If a broad concept of the defense were adopted and the decision whether to raise it were left with the accused, the problem would not be acute because a defendant would rarely advance the defense in a case other than murder. But if the proper disposition of the insane offender is deemed to be a matter in which society has the overriding stake and hence the State should invoke the civil process if mental disorder appears, the hospitals and their staffs would be incapable of coping with the added burden in the absence of additional resources which only the other branches of government can supply.

For all practical purposes the furor over *M'Naghten* is confined to the disposition of offenders convicted of murder. It is the death penalty which sparks the quarrel. Whatever may be their thesis of personal blameworthiness and of justice to the individual, I should think that all thoughtful persons would at least pause when judging a man at the portal of death. All doubts must congregate there. The ultimate responsibility with respect to capital punishment is, of course, legislative. But there is an area within the present statutory scheme in which the judiciary can and should move to accommodate the divergent views. I refer to the admission of full psychiatric testimony for the jury's consideration in determining whether a man should live or die.

I have no doubt that such testimony belongs in the case for that purpose. I am convinced the Legislature so intended when in resolving a controversy over capital punishment it provided that the jury shall fix the punishment. *State v. White*, 27 *N. J.* 158 (1958). The mental condition of a man is so inseparable from the issue of a just disposition—just to him and to society—that it is inconceivable that the Legislature intended to exclude it.

The functions of the mind are an integral part of the criminal event itself. The law requires a *mens rea*. The

specific mental operations necessary for guilt, be they premeditation, deliberation, and willfulness, or a felonious intent in a felony murder, cannot be isolated from the total functions of the mind of the offender. To limit the proof to that part of the total mental activity which technically bears upon the issue of guilt is to conceal part of the event itself. The whole truth should be disclosed so that in deciding the question of life or death the jurors will know who it is who stands before them. That disclosure is necessary for the moral judgment the jurors must reach.

Hence I agree with the view of Mr. Justice Francis in his concurring opinion in *Slate v. White, supra,* that such testimony should be admitted on the matter of punishment. The result would not be perfect justice, but it would be a stride toward it. It would meet what I believe is the underlying reason for the attack upon *M'Naghten.* It would preserve for society the lifetime grip upon the offender which it needs for its protection. And finally it would satisfy the well-founded complaint of the psychiatrist that he cannot testify as a medical expert when he is artificially fettered to the legal concept of insanity.

JACOBS and SCHETTINO, JJ., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.