The following opinion of the Supreme E'dlni, drawn up„„by *178 the Chief Justice, was communicated to the ensuing Court of Oyer and Terminer, in October 1828 s
The prisoner, James Guild, was, at the Oyer and Termines for Hunterdon County, in May last, found guilty of the murder of Catharine' Beakes. The court, at the instance of his counsel, humanely suspended the sentence of the law, in order that the opinion of the Supreme Court might be obtained, on some legal points which arose in the progress of the trial. These points were submitted to the court in the term of September, by the prisoner’s counsel, with distinguished ability, and with the most laudable zeal, research and industry; and they have received from the court,' the careful, anxious and mature examination, which their interest and importance, the situation of the prisoner, and the due administration of public justice, required.
The first question to be considered respects the admissibility of certain confessions of the prisoner which were received in evidence.
The deceased came to her death in the afternoon of the 24th day of September 1827. An inquest over the body was held by the coroner, at her place of abode, in the evening of that day. The prisoner, who was known to have been at work alone in The same afternoon in a corn field on the opposite side of the road, was brought' up by a constable, and, on being twice asked, denied that he knew any thing of the manner of her death. About ten o’clock on the next day, he made a verbal confession that he had killed the deceased, to Charles McCoy and others, and shortly after, a similar confession to one of the justices of the peace of the county, by whom it was reduced into the form of a written examination. The verbal confession and written examination, which took place within a short period of each other, were rejected by the court when offered in evidence, because induced, as the court believed, by delusive hopes of impunity excited, not by the justice, who appears to have acted with exemplary circumspection in the discharge of his duty, and without even a knowledge of the promises w'hicli had been made, but by other persons innocently misled by a common, and perhaps natural, but mistaken zeal to discover the perpetrator of a cruel and shocking outrage. The occasion does not call for an exams- *179 nation at large, of the propriety of the rejection of the proposed proof of these confessions. It is enough to say, that the rule of law by which the court was governed is sound, and there appears to have been enough of fact established, to warrant the court, in applying the rule to the exclusion of the evidence.
Confessions were afterwards made by the prisoner, in Feb - ruary succeeding, nearly five months after the perpetration of the offence. These confessions were admitted in evidence. The counsel of the prisoner insist that the admission was illegal, be - cause confessions of a like nature had been previously made under the influence of hope 5 and because these confessions per se and independent of the others were themselves made under the same delusive influence, and with an expectation that by perseverance in their narration, he should escape from punishment, and also, under the excitement of anger from reiterated taunts and accusations thrown out to him when in gaol.
The first of these grounds, the counsel of the prisoner sought to sustain by a reference to the recent and valuable treatise on evidence by Siarlcie, who says in part 4, pago 49, title admissions, “ where a confession has once been induced by such means, [threats or promises] all subsequent admissions of the same or of the like facts must be rejected, for they may have resulted from the same influence.” In examining the soundness of this doctrine, a shade of doubt is at once thrown over it by the fact that no such rule of evidence is to be found either in the ancient reports or in the elder writers. Neither Hale nor Haw* kins-, nor Gilbert nor Waster, nor Bacon nor Comyns, state any Kuril rule. It is first laid down, so far as my research extends, by ?Eust, in the second volume of his pleas of the crown, page 658. He cites no case, refers to no authority, but says it is the common practice to reject such subsequent confession. StarJcie refers only to a manuscript case of Rex v. White in Michælnas Term 1800; but, by whom decided, or in what court, or under what circumstances, he does not relate. It cannot be expected therefore, that we should yield an implicit deference to this position without an examination of the principles on which it rests; and such an examination will shew it, as broadly and unqualifiedly stated, to be unsound and unworthy of confidence, The reason given for the rule by Starlde, is, that the subse - quent admissions may have resulted from the antecedent inflo *180 ence. But in all sound logic, the question must turn, not on the possibility, but the presence of influencenot whether influence once ex,sted> but, whether it continued to exert its force. By the rule, as stated by Starkie, the single enquiry would be, has a previous admission been made under improper influence? And if thq answer be affirmative, the subsequent confession must be rejected, however thoroughly in the mean time the mind of the. accused may be freed from such influence, and however perfectly truth and freedom of volition may have resumed their sway. Surely such a rule cannot prevail unless it be shewn that the human mind having once lapsed into falsehood, must, by a necessity of its nature persevere, without motive or inducement. .For if it be true, and the assertion will receive on all hands a prompt and ready assent, that a man having, under given circumstances, made either a false or a true statement, may under other circumstances retract his allegations, and with equal assurance assert the converse of his previous declarations; then it follows that the true criterion is, the actual state of mind of the 'accused, at the time the confessions were made, and the true question for solution, whether, at that time, he was under undue influence of hope or fear. It is readily admitted, that the antecedent hopes or fears, or other sources of influence are to be brought into account and weighed. It may even be conceded that when once a confession under influence is obtained, a presumption arises that a subsequent confession of the same nature, flows from the like influence, and that such presumption should be overcome before the confession ought to be given in evidence. But such presumption being satisfactorily repelled, the evidence ought to be received. The rule stated by Starkie, as it goes further, is erroneous. It makes the presumption a conclusive and impregnable bar, and, if understood in its broad terms, excludes the proof, whatever subsequent circumstances to remove (he influence may have intervened.
. From a careful examination of principles, then, we are prepared to yield a full acquiescence to the doctrine laid down by Justice Drake, on this occasion, in bis charge to the jury in these words: “ Although an original confession may have been obtained by improper means, subsequent confessions of the same or of like facts may be admitted, if the. court believes from the length of time intervening, from proper warning of *181 tüe consequences of confession, or from other circumstances, that the delusive hopes or fears under the influence of which the original confession was obtained, were entirely dispelled.”
The rule of evidence seems to have been .thus understood, and has certainly been so practised, in the criminal courts of this country. In Williams' case, 1 City Hall Recorder 149, the mayor (Radcliff) of New-York, submitted to the jury to decide whether an examination in writing, taken in the police office had or had not been made under the influence of the threats, which had preceded and induced a previous confession to the prose eutor, and accordingly either to receive or reject the written confession. Its the case of Bowerhan and others, 4 C. H. Rec. 238, the mayor (Golden) said to the jury : It appears that in the first instance, an oral confession was made manifestly under the influence of a promise of favour, and subsequently an examination was taken in the police in the usual manner. Here no throats or promises were made, nor does it necessarily follow that because the oral confession was made under the influence of promises, that the written examination stands in the same situation, hut it will be for the jury to determine, from all the facts, whether the promises previously made continued their influence on tho prisoners mind at the time of the written examination; for, if so, then it is to be entirely rejected. The defendant, who had made the confession, with some of the others, was found guilty. In the caso of /dills and others, 5 C. H. Rec. 178, the mayor (Colden) charged the jury in a similar manner. In Millegan sind Welchman's case, 6 C. H. Rec. 78, Mr. Recorder Hiker, on an objection to evidence, recognized the same principle.
The true rule of evidence being thus shewn, we proceed to the second ground of objection raised by the prisoner’s counsel, and inquire whether the court had reason to believe, that the delusive hopes under which the original confession may have been obtained, were entirely dispelled ? Whether, when the confessions, given in evidence, were made, the mind of the prisoner was labouring under or was freed from undue influence r These questions present pure inquiries of fact. What in point of fact was the actual state of mind of the prisoner? We have seen that the Court of Oyer and Terminer acted under a correct view of the law. that they prosecuted their search into the facts on sound legal principles., and that they compared the facts *182 before them with a correct legal standard. Now the duty of this court when a reference, like the present, is made to us by that tribunal, is chiefly to examine and revise matters of law. So in England, when the advice of the twelve judges is required. We cannot review a question of fact with those advantages possessed by the court, before whom the witnesses have appeared. To pass in judgment on the conclusions of that Court, we ought to stand, if not on superior, at least on equal ground. Such a point of view may be obtained in the examination of legal principles ; but is rarely accessible in the search of facts. Hence, on this occasion, we might after an investigation of the legal doctrines desist, on this head, from further inquiry. But after expressing, as we are bound to do, a just deference for the determination of the court, we shall proceed to examine it under such lights as the report of the case affords us.
A period of between four and five months elapsed between the first confession and those which were afterwards made by the prisoner and received in evidence against him. In point of time, then the court may well have supposed, there was sufficient room for the first impressions to have subsided, and for the gleams of hope by which at the outset he may have been cheered, to have been dispelled. .Soon after the prisoner was brought to gaol, John Thompson, esq. one of the magistracy of the county, had an interview with him, and told him he must abide the consequences of the act which he had confessed, and that he could not hope to escape. It is very probable the prisoner was not aware, that he who thus addressed him was a justice "of the peace, yet he could not fail to observe his age and his grave and venerable appearance so likely to excite attention to his remarks. On Saturday morning succeeding the arraignment of the prisoner, he was visited by Daniel Cook, esq. With his person and official character, he was doubtless acquainted, for he was the same person before whom the examination in writing of the prisoner had been taken. He told the prisoner, that he must expect death, and prepare to meet it; and he mentions a striking fact serving tó shew the effect produced by the admonition. His countenance changed. His mind received and was touched by the awful warning of anticipated suffering. The delusion of hope was at the least shaken. By Charles Bonne!, esq. another magistrate, who sometimes saw him in gaol, he was cautioned against making *183 acknowledgments to the boys as he was accustomed. If upon his arrest, any delusive hopes induced his confession, the disappointment which so soon succeeded would very naturally have removed them. Instead of being better off, he saw his condition become worse. Instead of being clear, ho was placed in gaol; he was in-dieted ; publicly arraigned ; and assured by a respectable magistrate, that punishment would certainly overtake him. Such a failure of ill-raised expectations, would be apt to produce a revulsion of feeling. Confession had done him no service; had produced no alteration of his sufferings; had obscured instead of brightened his prospects of escape and impunity. What motive then to persevere in the avowal of his guilt ? Such avowal had availed him nothing ; and what hope then could have remained that any further confessions would be more beneficial ? Instead of realizing the anticipation of safety, he found these confessions had brought him positive assurances of a melancholy doom. When then, he persevered in making these confessions, it is a most reasonable inference, that he was actuated by some other motive than the undue influence of previously conceived hopes of impunity. His counsel said, on the argument before us, that having once made the confession, it was natural for him to persevere in the same tale. Such may be the result, if the confession were true. But a steady adherence to falsehood, which he saw produced him no benefit, and was assured would consign him to death, cannot, it is believed, be reconciled with any ordi nary principles of human conduct.
The counsel of the prisoner further insisted, that the taunts and reproaches to which ho was repeatedly exposed from idle hoys, who came to the door or passed by the window of his gaol, tended to keep up in his mind, an excitement unfavorable to the return of cool reflection. But the remarks made by him in any such moments of irritation, were not the confessions which were proposed as evidence on the part of the state, and whose admissibility are under consideration. And however he may have been led to reply harshly to remarks, equally harsh and thoughtless, to answer the fool according to - his folly, it does by no means result, that the same temper would be felt towards the numerous, and some of them very respectable persons, with whom he conversed, and in a manner apparently serious and deliberate, related the melancholy tale. The idea that *184 he saw in every person who approached him, an enemy, and therefore persevered in an avowal of the crime, is far more fan» ciful than just. Even a child would be prompted to silence in the presence of one whose hostility he knew or believed. If any thing escaped, the remarks would be few, even if harsh ; but for such a person to avow a crime, to relate its most minute details, to expose himself thereby, as he was repeatedly assured, to imminent danger of the most severe punishment, and the whole story to be a total falsehood, is inconsistent with nature and repugnant to credibility.
Upon a careful view, then of the circumstances of the case, we find no reason to disapprove of the conclusion in point of fact, which was drawn by the court, or to doubt of the propriety of their determination, to submit these confessions to the consideration of the jury; and, the more especially, as the court gave to the prisoner the advantage of a review of these facts, by the jury, and expressly charged them, that “ it was their business to consider the confessions with reference to the manner in which the first confession was obtained, and if they were not satisfied that the latter confessions were made freely and understanding^, and wholly free from any expectation of benefit, raised by the hopes and promises preceding the first confession, or from his continuing to tell an uniform story, it was their duty to reject them from their minds and not to make them the foundation of their verdict.”
It may not be without utility here to speak a word on a topic, briefly adverted to by the counsel at the bar, whether the admissibility of confessions objected to as improperly obtained, should be decided exclusively by the court, or should be submitted to the jury, to consider the question of fact and to reject or weigh them accordingly. The practice of the courts of criminal judicature on this head has not been altogether uniform. Hawkins, book 2, ch. 46. sect. 36, says, a confession obtained by the flattery oí .hope or the impression of fear, is not admissible evidence. In Rex v. Woodcock, Leach 4th edition 500, Chief Baron Eyre admitted declarations of a deceased person, and left it to the jury to consider, whether the deceased was not in fact under the apprehension of death, though she dtd not seem to expect immediate dissolution; and said if they were of opinion she was, the declarations were admissible, and, if of a contrary *185 opinion, they were inadmissible. In Rex. v. Hucks, I Starkie, N. P. 521, Chief Justice Ellenhorovgh said, that upon a ques-don proposed to the judges there, by the judges in Ireland, who entertained doubts on the subject, they were unanimously of opinion, that when a declaration had been made by a party in articulo mortis, whether under all the surrounding circumstances the declaration was admissible in evidence, was a question exclusively for the consideration of the court. In the cases, in the Mayor’s Court of New-X ork, above mentioned, the question of fact was submitted to the jury. In Aaron's case, 1 South. 240, Chief Justice Kirkpatrick said, “ If the confession however, rest ed upon the ground of hope and fear alone, doubtful as it mighs be, I should have been inclined to yield to its competency, and lo leave it to the discretion and judgment of the jury.” la many cases, both in this state and in our neighbouring states, courts have wholly rejected confessions, when clear and unequivocal evidence of undue influence was discerned. It is unnecessary however, for the sake of the present case, further to pursue this subject, for if the decision should be made by the court, such decision was made ; and if proper for the jury, it was submitted io them, in the most freo and unbiassed manner. Of the opinion of both court and jury, on this point then, the prisoner enjoyed the advantage.
We are now to examine, under the request of the Court of Oyer and Terminer, whether the evidence in the case was sufficient, in legal contemplation, to warrant the conviction of the prisoner.
In the first place, it is insisted by his counsel, that a verdict ought never to be founded on naked and uncorroborated confessions ; and to support this position, they have in a great measure relied on the opinion expressed by Justice Rossell in Aaron's case, 1 South. 242, “ that no person indicted for a capital offence shall be convicted on his own confession, without a single circumstance to corroborate it.” If the learned judge is to be understood to mean, when the corpus delicti is not otherwise proved, as when io larceny no proof is given of the taking of the goods, or in murder, the fact of the death is in no wise shewn, and when the whole case depends on the mere confession of the accused, a number of cases will be found to support the doctrine. But if he is to bo understood, that even when she corpus delicti is otherwise established, the confession of the *186 prisoner alone is not sufficient, if the jury believe it to be tmei to produce a conviction, the opinion stands opposed to very high authority. The only case, referred to by the judge, is from Leach’s crown law 320, Alexander Fisher’s case. This citation was evidently made from the first edition of Leach, and Justice Heath, on a trial at the assizes, is there reported to have laid down the rule in substance as above stated. But Fisher’s case, was mis.reported by Leach in that edition, and is one of the many errors, which he says in the preface of his subsequent editions, that he has corrected. In the 4th edition published in 1815, vol. 1, page 311, the same case is to be found, and the point decided, as there reported, is wholly different. “ There was no other evidence.” says the Reporter, “ to fix these facts upon the prisoner, than his confession made on his examination before the committing magistrate, and there being no evidence, that this confession was not reduced into writing, viva voce testimony of it was rejected.” In the same page, Leach reports the case of John Wheeling, tried before Lord Kenyon, at the summer assizes at Salisbury 1789, in which it was determined that “a prisoner may be convicted on his own confession, when proved by legal testimony, although it is totally uncorroborated by any other evidence.”
Hawkins, book 2, ch. 46, s. 38, says — “ If a confession be voluntarily made, and regularly proved on the trial, it is sufficient if the jury believe it to be true, to convict the prisoner, without any corroborating evidence to support it.” Phillips in his treatise on evidence, says, “a free and voluntary'confession, made by a prisoner to any person at any time or place, is strong evidence against him, and, if satisfactorily proved, sufficient to convict, without any corroborating circumstance.” 1 Phil. Ev. 81. And afterwards he says: “It appears now to be an established rule, that a full and voluntary confession by the prisoner of the overt acts, charged against him on indictment for treason, is of itself sufficient evidence to warrant a conviction.” Ibid. 85. Starkie says, a “ prisoner may be convicted on his own confession without other evidence.” Starkie Evid. part 4, page 53. An opinion on this point need not however, be here expressed, nor need the enquiry be further prosecuted, for it will, I think, be demonstrated, in the sequel, that the confessions are “ strong and pregnant,” “ disclosing and bringing forth facts and circumstances,” and *187 that there are circumstances corroborating these confessions of a peculiarly pointed and persuasive character. In the first place, however, it becomes material to a correct • understanding of the subject, to settle what is meant by the qualification, “ corroborating,” annexed to the term “ circumstances.” The phrase clearly does not mean facts which, independent of the confession, will warrant a conviction, for then the verdict would stand not on the confession but upon those independent circumstances. To corroborate is to strengthen, to confirm by additional security, to add strength. The testimony of a witness, is said to be corroborated, when it is shewn to correspond with the representation of some other witness, or to comport with some facts otherwise known or established. Corroborating circumstances then, •used in reference to a confession, are such as serve to strengthen it, to render it more probable, such in short as may serve to impress a jury with a belief of its truth. In this view of the subject, the evidence in this cause affords circumstances corroborating, in a singular and remarkable manner, the confessions which were proved. I shall briefly state them. The prisoner said, he went to the house of the deceased, for the purpose of borrowing a gun. It was proved a gun bad been kept there, and that the prisoner knew it. He said she refused him the gun, and accused him of having done mischief to her pig and pigeons. It was proved that she bad entertained a belief, that such mischief had been done by him. He confessed he had struck her with a yoke. The witness, who first saw her after the disaster, testified that he found a yoke and blood on it lying near her. The prisoner confessed that, as he was going out, after she had refused his request, he saw the yoke by the door, picked it up and went back. Jonathan Yankirk, who resided in the house, testified to the jury that when ho went out about noon to work, the yoke was by the side of the door. The prisoner stated that she was on the hearth. M'Coy, the first who saw her, found her lying in the corner of the fire place. He stated that she was starching a cap. A cap, says M'Coy, lay on the hearth by the side of her. To Philip Knowles he related the story, and confessed he struck her a first, second, third, and fourth time. M’Coy testified' there were four wounds — one on the top of her head, one on the right temple, one on the right, eye, and one on the under jaw. The minute detail of incidents and the steady uniformity *188 of his relations to a number of persons, are not among the least striking of the circumstances which mark these confessions. One 1 supposed discrepancy only has been observed or pointed out. To one of the witnesses he said, the deceased was sitting by the fire, blowing the fire. To another, that she was starchfng a cap and stooping down on the hearth. No difficulty however, seems to exist in reconciling these representations by supposing that he spoke of different points of time.
In this view of the case, a most marked difference from that of Aaron, on which the prisoners counsel placed much reliance, cannot escape observation. No attending circumstance stated by him was proved to have existed ; and although before the coroner’s inquest, and for three or four weeks after he was put in gaol, he continued to make the confessions, yet afterwards, and until the time of trial, he steadily denied the truth of what he had confessed.
In the charge to the jury the court say, “there are some coincidences' between the facts detailed in his confession and the real state of things, as testified by other witnesses 5 these would he strong proofs of guilt, if he could not have learned them from any other means, excepkby having gone to the house and seen the body and other things as they really were. But his confessions were made long after, there were Other sources of information, and if you think it probable, or possible, that it was furnished from other sources, the evidence arising out of these coincidences will have but little weight.” In this passage, as well as in every other part of a very judicious charge, we see the cautious and humane intentions of the judge, that on so deeply, important an occasion, no proper considerations should be overlooked by the jury, and that every thing which might justly have weight infavorem viice, should be presented to their view. These considerations were earnestly urged before us by the prisoner’s counsel. But that a youth, like the prisoner, should carefully treasure up from time to time the fragments of information which he might have heard; that he should weave them together into a connected and consistent tale ; that he should uniformly and repeatedly relate them, and in the same manner, and all this, not as an avowal or argument of innocence, hutas a declaration of atrocious guilt, was, in our opinion, very properly considered by the jury to be beyond all reasonable bounds of credibility. And it *189 ould not have escaped their observation, that in no paiiieular, siot even the slightest, was his confession contradicted, or found Inconsistent with the facts or in any wise disproved.
The age of the prisoner was earnestly pressed on our eonsid» eration by his counsel, who strenuously insisted he was too young to be exposed to punishment on such evidence. At the perpetration of the offence fas was aged twelve years and somewhat more than five months. The sound, sensible and legal rule on this head is, in roa opinion, judiciously, as well as lucidly, stated by Justice Southard in the ease of Aaron. (i This capacity,” says he, “ to commit a crime, necessarily supposes the capacity to confess it. Ho who is a rational and moral agent, and can merit the infliction of legal sanctions, must be able to detail his motives and acts, and must be judged by them. If therefore She defendant was of an age to be punished, he was of an age to confess his guilt.” These principles are conformable to the most approved and respected authorities. In Leach’s edition of Hawkins, B. 1. C. 1. page 1, in note, it is said, “ from this supposed imbecility of mind, the protective humanity of the law will not, without anxious circumspection, permit an infant to be convicted on his own confession. Yet if it appear, by strong and pregnant evidence and circumstances j that he was perfectly conscious of the nature and malignity of the crime, the Verdict of a jury may find him guilty and judgment of death be given against him.” Blackstone says, “ in very modem times, a boy of ten years old was convicted on his own confession, of murdering bis bed fellow, there appearing in his whole behaviour plain tokens of a mischievous discretion, and as sparing this boy merely on account of bis tender years, might be of dangerous consequence to the public by propagating-a notion that children might commit such atrocious crimes, with impunity, it was unanimously agreed by all the judges that he was a proper subject of capital punishment.” 4 Bl. Com. 23. The case mentioned by Blackstone is reported at large by Coster. The evidence was the confession of the boy, with some circumstances tending to corroborate the confession, but in one respect widely different from the present case, for one, and a leading circumstance, which be stated was found to be entirely untrue. York’s ease, Foster 70.
In regard to a youth of the years of the prisoner, the law most wisely requires the utmost circumspection kom the jurors $ and *190 it is satisfactory to find that in the present case the jury were distinctly reminded of their duty. “ This fact,” says the judge in his charge, “ should make you more cautious in admitting the confessions and induce you to resolve your doubts in his favor.”'
Under a deep sense of responsibility, after a careful deliberation, and feeling the strongest impression of the tenderness due to the life of a fellow creature, we hold ourselves bound to advise the Court of Oyer and Terminer not to grant a new trial, but to proceed to discharge the solemn duty which remains to them, by pronouncing the sentence of the law on the crime of murder.
The prisoner was sentenced and executed.