IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35957-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| T. M., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Appellant Timothy Martin raises important questions about the criminality of horseplay behavior of a fourteen-year-old boy. Nevertheless, being bound by Washington statutes and case law, we affirm the juvenile court's conviction of Martin of second degree assault.

FACTS

Because the State brought charges against Timothy Martin, a minor, a bench trial ensued. In turn, the juvenile court entered thirty-three findings of fact, to which Martin assigns no error. We glean the facts from the findings and some trial testimony. We use pseudonyms for all minors, including defendant.

In June 2017, friends Timothy Martin, Andrew Christopher, and Bob Simpson attended eighth grade at a middle school. Martin and Simpson participated in the school's wrestling team.

At the end of the school day, Timothy Martin, Andrew Christopher, and Bob Simpson, with other classmates, returned to the classroom from playing outdoors. Christopher sat on a desk and talked to Simpson. Fourteen-year-old Martin silently approached Christopher from behind and placed a wrestling choke hold around Christopher's neck. Christopher felt pain and could not breathe. Christopher fearfully grabbed Martin's arm. A surprised Simpson observed the hold and estimated that Martin squeezed Christopher's neck for ten to fifteen seconds. Martin estimated he choked Christopher for five to ten seconds.

The school's wrestling coach did not teach team members the choke maneuver employed by Timothy Martin on Andrew Christopher. According to Martin, he used a professional wrestling choke hold. Martin had viewed the hold during professional wrestling matches and noticed that the match referee ended the fight when a wrestler applied the move. Martin knew, before June 2017, that the choke hold could stop a person's breathing and render the person unconscious.

According to Timothy Martin, he executed the choke hold on Andrew Christopher in order to demonstrate the maneuver to Bob Simpson. Martin did not intend to interrupt Christopher's blood or air flow, but wished to "control" Christopher's body. Report of Proceedings (RP) (Feb. 13, 2018) at 22, 23. Because of the roughhousing among boys at the school, Martin believed that he had license to display the move as long as he did not hurt Christopher.

The classroom teacher was stacking chairs when he heard Timothy Martin call: "Don't tap out." RP (Feb. 12, 2018) at 52. The teacher turned to observe Martin with one arm around Christopher's neck and the hand from the other arm clasping the first arm thereby creating a V shape. The teacher yelled to Martin to release Christopher. Martin denies hearing the teacher. According to Martin, he freed Christopher because the latter got "very heavy." RP (Feb. 13, 2018) at 26. Regardless, Martin loosened his grasp. An unconscious Christopher collapsed to the floor. As he dropped, Christopher's chin struck the leg of a desk. Christopher regained awareness while sprawled on the classroom floor.

Andrew Christopher bled profusely from a gash under his chin that required six sutures. Christopher also sustained a broken jaw and a cut to the bridge of his nose. A physician wired shut the jaw for six weeks.

Timothy Martin was truly remorseful after Christopher sustained injuries. As the teacher walked Martin and Andrew Christopher to the principal's office, Martin cried and apologized.

## PROCEDURE

The State of Washington charged Timothy Martin with a single count of second degree assault under RCW 9A.36.021(1)(g), which subsection prohibits assault by strangulation. The State later amended the information to include an alternative means of committing assault in the second degree by intentional assault that recklessly inflicts substantial bodily harm under RCW 9A.36.021(1)(a). Martin stipulated that Andrew

3

Christopher's injuries constituted "substantial bodily harm." RP (Feb. 12, 2018) at 31-33.

During trial, the State presented testimony from Bob Simpson, Andrew Christopher, and the classroom teacher. Timothy Martin testified on his own behalf. Martin declared:

> Well, I mean in the move I consciously know if you hold them in there for too long with the amount of pressure, which I wasn't, but then eventually somebody could be rendered unconscious.

RP (Feb. 13, 2018) at 26.

Timothy Martin hired psychologist Paul Wert to assist in his defense. Wert specializes in evaluating and treating youth. Dr. Wert performed a psychological evaluation and risk assessment on Martin. Wert prepared a report, which read, in part:

> [Timothy Martin] did not have the intent to choke [Andrew] into a state of unconsciousness, which would then result in a fall with [Andrew] receiving serious injuries.

Clerk's Papers (CP) at 31.

Before trial, the State moved to preclude Dr. Paul Wert from opining regarding Timothy Martin's intent when Martin placed his arms around Andrew Christopher's neck. Martin conceded that Wert could not testify that Martin lacked intent. The defense instead offered Dr. Wert's testimony to establish that Martin engaged in impulsive action typical for a fourteen-year-old boy. Martin's counsel remarked:

4

> And the State has to prove there was an intent to commit a crime and that that crime was a—showed a reckless indifference. And a reckless indifference requires reasonable person. And when we're talking about reasonable person here, we're talking reasonable person for a 14-year-old. So a 14-year-old male, would his behavior be so recklessly indifferent. And Dr. Wert can address that issue as well because he can talk about what data shows about behaviors of a 14-year-old male and where, really, we draw the line for reckless indifference and just, you know, kind of stupid horseplay. So it's that I'd like to address.

RP (Feb. 12, 2018) at 24. Counsel's expectations of the extent of the testimony sought from Paul Wert may have exceeded the scope of the testimony sought by the State, in its written motion, to be excluded. In response, the prosecution commented that Wert's report never mentioned "recklessness." RP (Feb. 12, 2018) at 26.

The juvenile court excluded testimony from Paul Wert as to the intent formed by Timothy Martin when choking Andrew Christopher. In so ruling, the court relied on the evidence rule that a witness cannot testify to the ultimate issue in a case. The court reserved a ruling on the extent to which Wert could testify beyond an opinion as to intent.

During trial, Dr. Paul Wert testified to scientific data regarding juvenile brain development. Wert explained that research using MRIs destroyed assumptions about adolescent brain growth. Brain development moves slow and in spurts. Growth and maturity of a teenager focuses on different locations inside the brain and varies at different times. Contrary to earlier understanding, the prefrontal cortex, which controls decision making and emotions, does not fully develop until the person reaches beyond the age of 20 and sometimes as late as age 25. The lack of brain development impairs

decision making in an adolescent. Due to hormonal differences between the sexes, weakened judgment inflicts teenage males more than females. Dr. Wert opined that:

> adolescents today do have a tendency to leap before they look and there's not a great deal of planning that goes into some of the impulsive acts and a lot of times they don't anticipate the consequences of what might occur given a specific behavior on their part.

RP (Feb. 13, 2018) at 59.

Defense counsel later proffered questions to Dr. Paul Wert to which the State objected. The following exchange transpired:

> [DEFENSE COUNSEL]: . . . Dr. Wert, again, I can't ask you to draw a legal conclusion so I'm not asking you to comment or opine if [Martin] had intent to commit assault on June 2nd. However, what I want to ask you is your opinion on what the reasons, based on your knowledge of all the facts in interviewing [Martin], the police report, for [Martin] to have put this wrestling move on [Christopher].
> [THE STATE]: Objection, Your Honor.
> THE COURT: I would sustain it to what's in his mind, actually the form of the question.
> [DEFENSE COUNSEL]: Do you have an opinion on what [Martin's] goal was here?
> [THE STATE]: Objection, Your Honor.
> THE COURT: I'll sustain it to the form of the question.
> [DEFENSE COUNSEL]: Did [Martin] tell you what his motives were when he put the wrestling move on [Christopher]?
> [THE STATE]: Objection, calls for hearsay.
> THE COURT: It's hearsay of the defendant. I'll overrule.
> . . . .
> [DR. WERT]: I don't believe that I specifically asked [Martin] what motivated the behavior. I do know what he had—I think I know what he had in mind when he executed the behavior but what may have motivated that or what may have been multiple motivators, and I think it would just be speculative on my part.
> . . . .

6

[DEFENSE COUNSEL]: Okay. If you were the decision maker here, what characteristics or factors or facts would you look to in determining what the goal of the defendant is?

[THE STATE]: Objection.

THE COURT: And I'll sustain it to the form of the question.

[DEFENSE COUNSEL]: In the studies you read and were aware of, what factors have been contemplated in determining motivations for impulsive behavior?

[THE STATE]: Objection, Your Honor, as relevance.

THE COURT: And I would sustain as to relevance.

[DEFENSE COUNSEL]: Your Honor, what I'm trying to get out is, if I haven't already, is what he would consider as the expert here of juvenile behavior, what he would consider as relevant for the decision maker when determining what the motivation was. So I'm not getting into intent but there are factors that scientists in this area have looked to and they would be interactions of the parties. They would be how—

[THE STATE]: Objection, Your Honor, speaking.

THE COURT: Counsel, the whole point of this was to give some general knowledge about basically brain thinking in adolescents, but you're going into very specifics and the truth of the matter asserted, so at this point the Court is going to sustain it . . . .

RP (Feb. 13, 2018) at 59-62.

During closing argument, Timothy Martin's counsel commented in part:

The last quote I have from this court [the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012)] and decision is that the court stated: "Just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in assessing his culpability." And that is what Your Honor is doing here, is assessing his culpability.

Following the direction from our United States Supreme Court, I ask that Your Honor consider [Timothy's] age, lack of maturity, and underdeveloped sense of action and consequences when you render your judgment today.

. . . .

7

> Between Dr. Wert's testimony regarding behavior of juvenile males, between [Bob Simpson's] testimony about the boys jostling, pushing, shoving, and between [Kate's] testimony that boys engage in that behavior, I don't see how Your Honor could find that [Timothy's] behavior was a gross deviation from conduct of a reasonable 14-year-old male.

RP (Feb. 13, 2018) at 71-72, 75. The prosecution replied in part to defense counsel's

closing:

> Going back to the beginning of defense closing argument, *Miller v. Alabama* is a sentencing decision. The courts consider youthfulness when it sentences, not at the culpability stage. Basic issue in *Miller v. Alabama* was we can't sentence children to life without parole without consideration of their youthful minds. There is no different standard of intent for a 14-year-old than there is for an 18-year-old. It's all the same statute, it's all the same standard.
> . . . .
> I want to talk about the reasonable person standard because the recklessness, obviously a reasonable person is a part of whether or not something is reckless. Now, the reasonable person is a legal fiction. . . . So we don't judge what a reasonable person would do in the legal sense based on what other kids are doing. We judge what a reasonable person would do as the Court decides or determines what that standard of person should be held to.

RP (Feb. 13, 2018) at 79-80.

The juvenile court found Timothy Martin guilty of second degree assault under

both subsections (a) and (g) of RCW 9A.36.021(1). The court entered the following

conclusions of law:

> 35. The law defines an assault as an intentional touching or striking of another person that is harmful or offensive, and that touching would be offensive if the touching would offend an ordinary person who is not unduly sensitive.

8

36. A person acts with intent or intentionally when they act with an objective or purpose to accomplish an act or result that constitutes a crime.

37. A person acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur, and that this disregard is a gross deviation from the conduct that a reasonable person would exercise in the same situation.

38. The law defines strangulation as compressing a person's neck and thereby obstructing the person's blood flow or their ability to breathe.

39. [Timothy Martin] did assault [Andrew Christopher]. Assault is defined as an intentional touching that would be offensive to an ordinary person, and the fact that [Martin] grabbed [Christopher] around his neck and squeezed it to control his body would be offensive to an ordinary person.

. . . .

41. The act was intentional as intent is defined as a person acting with an objective or a purpose to accomplish a result.

42. [Martin's] intent was to choke hold [Christopher] to control his body, and the fact that he controlled it to the point where [Christopher] lost consciousness was more than [Martin] expected, but his objective was to wrap his arm around and seek control.

43. The control was used by obstructing his airway. [Christopher] testified he couldn't breathe, and [Bob Simpson] testified that he saw that [Christopher] couldn't breathe. That result does constitute a crime.

44. The State charged both alternatives—intentionally assaulting another by strangulation and/or recklessly inflicting substantial bodily harm.

45. A person acts recklessly when he knows and disregards that substantial risk that a wrongful act may occur, which in this case was by using a choke hold causing loss of air to the victim, even [Martin] testified that he knew there was a possibility. His disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

46. In the alternative, the State has to prove the defendant intentionally assaulted [Christopher] by strangulation. Since strangulation is defined as compressing a person's neck, obstructing their ability to breathe, [Christopher] testified that [Martin's] arm restricted his ability to breathe.

47. The Court finds beyond a reasonable doubt that [Martin] is guilty of the crime of second degree assault as charged under both alternatives as either one of them fits the facts.

CP at 90-92.

9

Timothy Martin requested the court make a manifest injustice finding and impose a downward departure from the standard range commitment to the juvenile rehabilitation administration of 15-36 weeks. The juvenile court agreed that the standard range of confinement would effectuate a manifest injustice and imposed an exceptional sentence of fourteen days' confinement converted to electronic monitoring. The court also imposed twelve months of community supervision and eighty hours of community service.

## LAW AND ANALYSIS

On appeal, Timothy Martin asserts evidentiary error and error in the juvenile court's application of the law. We first address Martin's assignment of error concerning exclusion of evidence.

## Testimony of Paul Wert

In an assignment of error, Timothy Martin complains that the juvenile court abused its discretion when sustaining the State's objection to testimony from Dr. Paul Wert regarding "what factors have been contemplated in determining motivations for impulsive behavior?" In the argument section of his brief, Martin adds additional questions that he contends the trial court should have allowed Wert to answer. He paraphrases the questions as:

> What . . . is your opinion on the reasons, based on your knowledge of all the facts in interviewing [Timothy Martin], the police report, for [Timothy Martin] to have put this wrestling move on [Andrew Christopher][?]

10

> [Do you have] an opinion on what [Timothy's] goal was here?
>
> What characteristics or factors or facts would you look to in determining what the goal of the defendant is?
>
> What factors have been contemplated in determining motivations for impulsive behavior?
>
> [What] factors [would] scientists in this area have looked to and they would be interactions of the parties[?]

The questions posed to Dr. Paul Wert assume that a psychologist may opine as to a person's motivations and goals. Martin cites no law to support this assumption. An expert witness may not testify to motivations of another. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 209 F. Supp. 3d 612, 661 n.67 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017); *Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 338, 657 N.W.2d 759 (2002); *Benjamin v. Torgerson*, 295 Mont. 528, 985 P.2d 734, 740 (1999). Courts do not permit expert witnesses to testify as to the knowledge, motivations, intent, state of mind, or purposes of others. *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 80 (N.D.N.Y. 2013).

The questions posed to Paul Wert also assume the relevance of the reasons for, motivations of, and goals of Timothy Martin when choking Andrew Christopher. To establish this relevance, Martin argues that the questions addressed an adolescent's impulsivity. Nevertheless, Martin presents no case law identifying impulsivity as a defense in an assault prosecution, even with a juvenile defendant. When Martin

11

introduced background evidence as to the impulsivity of teenage boys, able trial counsel probably prevailed on the juvenile court to hear evidence beyond that to which Martin was entitled.

Timothy Martin also argues that the questions posed to Dr. Paul Wert addressed whether Timothy Martin formed an intent to assault. Nevertheless, during trial, Martin conceded that Wert could not opine as to Martin's intent.

Adolescent Brain Development

Timothy Martin next contends the trial court erred when refusing to consider adolescent brain development when determining whether Martin's conduct violated modern standards applicable to the determination of juvenile culpability. In essence, Martin advocates the application of a reasonable person standard of a fourteen-year-old boy, rather than an adult standard of care when assessing Martin's criminal culpability. In addition to disagreeing with the substance of Martin's argument, the State asserts that Martin failed to raise the contention before the juvenile court. In turn, the State asks this court to decline to address the assignment of error.

Typically, this court will not review any claim of error not raised in the trial court. RAP 2.5(a); *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). Nevertheless, we conclude that Timothy Martin raised the contention before the juvenile court. Martin

12

introduced testimony and sought to introduce even more testimony from Dr. Paul Wert about the impulsivity of the behavior of a teenage boy. The sole purpose of the testimony would be to convince the judge to lower a standard of culpability for a fourteen-year-old boy. More importantly, trial counsel introduced her closing statement by referencing United States Supreme Court jurisprudence about the sluggish growth of brain development. During summation, trial counsel commented that the court could not find that Martin's behavior grossly deviated from the conduct of a reasonable 14-year-old male.

In arguing on appeal that the trial court should have considered the brain development of a teenager and should have applied a fourteen-year-old standard of care, Timothy Martin cites cases involving sentencing of juveniles and cases involving *Miranda* warnings to children. Martin also relies heavily on an excellent law review article advocating the extension of the logic behind United States Supreme Court sentencing decisions regarding the immaturity of teenagers to substantive criminal law. JENNY E. CARROLL, *Brain Science and the Theory of Juvenile Mens Rea*, 94 N.C. L. Rev. 539, 540 (2016). Nevertheless, he forwards no decision that holds the court should consider brain development when assessing culpability or the ability of a teenager to form an intent to commit a crime. Martin forwards no case that applies a teenager mens rea standard of care in a criminal prosecution. A change in the law will need to come from the Washington State Legislature or the state Supreme Court.

RCW 9A.04.050 declares:

> Children under the age of eight years are incapable of committing crime. Children of eight and under twelve years of age are presumed to be incapable of committing crime, but this presumption may be removed by proof that they have sufficient capacity to understand the act or neglect, and to know that it was wrong.

Timothy Martin was age fourteen at the time of his offense.

### Sufficiency of Evidence

Finally, Timothy Martin contends the juvenile court failed to consider the mens rea of the two subsections of RCW 9A.36.021 that define the two alternative means under which the State prosecuted Martin for second degree assault. The contentions indirectly challenge the sufficiency of evidence for the conviction. We address each subsection separately.

### *RCW 9A.36.021(1)(a)*

Under RCW 9A.36.021(1)(a), a person commits assault in the second degree if he or she:

> intentionally assaults another and thereby recklessly inflicts substantial bodily harm.

A person acts:

> intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime.

RCW 9A.08.010(1)(a).  A person acts recklessly:

>       when he or she knows of and disregards a substantial risk that a
> wrongful act may occur and his or her disregard of such substantial risk is a
> gross deviation from conduct that a reasonable person would exercise in the
> same situation.

RCW 9A.08.010(1)(c).

As to the crime of second degree assault under RCW 9A.36.021(1)(a), the mens rea of intent applies to the assault, while the reckless mens rea relates to the result of substantial bodily harm.  *State v. Keend*, 140 Wn. App. 858, 866, 166 P.3d 1268 (2007).  The crime does not require specific intent to accomplish any result or to inflict substantial injury.  *State v. Keend*, 140 Wn. App. 858, 866 (2007); *State v. Esters*, 84 Wn. App. 180, 185, 927 P.2d 1140 (1996).  The assault itself only requires intent to do the physical act constituting assault.  *State v. Keend*, 140 Wn. App. at 867.

Timothy Martin claims that the trial court erred when it failed to consider the two mens rea requirements in RCW 9A.36.021(1)(a).  He argues that the evidence did not establish that he knew, at the time he placed his arms around Andrew Christopher's neck, that he might cause substantial bodily injury.  Martin relatedly contends that he did not intend to harm Christopher.  These arguments avert the legal standards for criminal culpability under RCW 9A.36.021(1)(a), since the State did not need to prove intent to harm or that Martin knew the choke hold would cause substantial bodily injury.  The

State needed to only prove the intent to touch Christopher and the recklessness that led to substantial injury.

In its conclusions of law, the juvenile court resolved that Timothy Martin intentionally grabbed Andrew Christopher around Christopher's neck and squeezed the neck to control Christopher's body. The juvenile court also concluded that Martin acted recklessly because he knew squeezing the neck would cause the loss of air. He knew that referees in professional wrestling stopped a match when one participant executes the choke hold that Martin fixed on Christopher.

In reviewing convictions for sufficiency of the evidence, this court considers whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The challenge admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d at 201. Sufficient evidence supported the juvenile court's ruling that Timothy Martin assaulted Andrew Christopher and recklessly inflicted substantial bodily injury.

*RCW 9A.36.021(1)(g)*

We move to the alternative means of committing second degree assault. A person is guilty of the crime of assault in the second degree by strangulation when that person

16

intentionally "[a]ssaults another by strangulation." RCW 9A.36.021(1)(g). RCW

9A.04.110(26) defines "strangulation":

> "Strangulation" means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe.

Accordingly, in order to convict Timothy Martin under this alternative, the State needed

to prove that Martin intentionally assaulted Andrew Christopher and that Martin

obstructed Christopher's blood flow or ability to breathe by compressing his neck or that

Martin compressed Christopher's neck with the specific intent to cause this result. The

State did not need to prove that Martin intended to cut off Christopher's blood flow or

ability to breathe, only that Martin intentionally touched Christopher with the result that

Martin severed the blood flow or breathing.

The juvenile court concluded that Timothy Martin intentionally assaulted Andrew

Christopher by strangulation. Substantial evidence supports this conclusion. The

classroom teacher testified that he observed Martin with Christopher in a choke hold and

Martin was squeezing the hold. Fellow classmate Bob Simpson testified that Martin

squeezed Christopher's neck for approximately fifteen seconds and that Christopher

could not breathe. Christopher testified that Martin came from behind and placed him in

a choke hold, with the result that he could not breathe. When Martin released

Christopher, an unconscious Christopher collapsed to the floor.

17

No. 35957-3-III
*State v. T.M.*

CONCLUSION

We affirm the juvenile court's conviction of Timothy Martin for second degree assault.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, J.

18

No. 35957-3-III

FEARING, J. (concurring) — Timothy Martin asserts an important argument central to our American criminal justice system about the criminal culpability of adolescents. Anatomic research and the law of sentencing recognizes the impediments in teenagers and young adults to render informed, rational judgments. A thin line lies between crime and punishment. This enlightening physical research into brain development should not only influence the law of punishment but impact when the law determines the acts of a minor to constitute a crime. If the legislature does not act, I propose changes to the substantive criminal law through the courts based on the science of adolescent brain advancement. Just as the courts have modified the law of sentencing without input from legislatures, courts should modify their view of the criminal behavior of teenagers.

My concurring brother asserts that the courts should not change the law and create a child mens rea standard for the conduct of teenagers. According to my brother, the legislature can only alter this area of the law. Nevertheless, Washington courts, without input from the legislature, created the doctrine of diminished capacity. *State v. Carter*, 5 Wn. App. 802, 803-05, 490 P.2d 1346 (1971). A standard that applied a reasonable child of the defendant's age would constitute a form of diminished capacity.

My concurring brother may write that the legislature holds the unfettered discretion in criminalizing or decriminalizing conduct. This proposition cannot be true, because courts have always reserved for the judiciary the prerogative to declare some crimes or criminal behavior unconstitutional. *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (declaring unconstitutional a Texas statute criminalizing sodomy between two persons of the same sex); *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (declaring unconstitutional a Texas statute that criminalized the burning of the American flag); *State v. Ruff*, 122 Wn.2d 731, 861 P.2d 1063 (1993) (declaring unconstitutional a Washington statute that created the crime of possession of a short firearm by one acquitted of a crime by reason of insanity); *City of Seattle v. Bittner*, 81 Wn.2d 747, 505 P.2d 126 (1973) (declaring unconstitutional a city ordinance criminalizing the failure to obtain a license to show pornography).

The legislature holds similar extensive power, as it has in defining crimes, when establishing the punishment for the violation of crimes. *State v. Bryan*, 93 Wn.2d 177, 181, 606 P.2d 1228 (1980); *State v. Bergen*, 186 Wn. App. 21, 28, 344 P.3d 1251 (2015). In opposition to requests from juveniles to invalidate, as unconstitutional, the death penalty or life without parole sentences, States have argued that courts should not interfere with the legislature's prerogative to fix the punishment for crimes. *State v. Ronquillo*, 190 Wn. App. 765, 773-74, 361 P.3d 779 (2015); *Cook v. State*, 242 So. 3d 865, 878 (Miss. Ct. App. 2017). Despite this argument, the United States Supreme Court and the state Supreme Court have invalidated juvenile sentencing statutes on

2

constitutional grounds. *Montgomery v. Louisiana*, 577 U.S. __, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016); *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *State v. Bassett*, 192 Wn.2d 67, 428 P.3d 343 (2018).

Convicting a teenager of a crime and thereby administering any punishment, no matter how light the sentence, implicates the United States and the Washington State constitutions. The federal constitution's cruel and unusual punishment proscription and the state constitution's prohibition on cruel punishment demand that the court consider the immaturity of the offender when sentencing him or her. One could conclude that punishing a child for behavior that he fails to comprehend to be wrong constitutes cruel punishment.

Case law accepts the proposition that, in some instances, the cruel and unusual punishment clause prohibits any punishment. The clause imposes substantive limits on what can be made criminal and punished. *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S. Ct. 1401, 1410, 51 L. Ed. 2d 711 (1977); *Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962); *Abdool v. Bondi*, 141 So. 3d 529, 547 (Fla. 2014); *State v. Adams*, 91 So. 3d 724, 745 (Ala. Crim. App. 2010). This latter protection governs the criminal law process as a whole, not only the imposition of punishment postconviction. *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019). The State may not criminalize

"being"; that is, the state may not punish a person for who he is, independent of anything he has done. *State v. Adams*, 91 So. 3d 724, 747 (Ala. Crim. App. 2010).

When I attended junior high school and senior high school, my friends and I engaged in some of the same idiotic behaviors for which teenagers are now sometimes being prosecuted. My friends and I would have spent time in detention, a pleasant word for "incarceration," and gained a criminal record.

A remorseful and weeping Timothy Martin immediately recognized the stupidity of his conduct as he walked to the principal's office. Under these circumstances, injecting Martin into the criminal justice system served no purpose. A standard range sentence would have sent Martin into incarceration. Timothy Martin's wise juvenile court judge recognized the excess of placing Martin in detention and imposed a significant downward departure from the standard range when sentencing Martin and when permitting home monitoring.

_____
Fearing, J.

4

No. 35957-3-III

KORSMO, J. (concurring) — Although I agree with the majority's resolution of the issues presented by this appeal, I write separately due to the concurrence's decision to give appellant's arguments an extended consideration beyond that needed to resolve this case. Appellant suggests treating immaturity as a defense to criminal liability instead of continuing to treat it as a factor mitigating punishment. This is an exceptionally dangerous idea with potentially profound consequences for young adults in our society.

First, since the concurrence all but invites commentary on the subject, I will ruminate on the role of judges in this arena. It is virtually nonexistent. There are no common law crimes in Washington. Instead, the legislature has long defined all offenses, including the enactment of our modern criminal code and the juvenile justice act, as well as their progenitors. *See* LAWS OF 1975, 1st Ex. Sess., ch. 260 (criminal code); LAWS OF 1909, ch. 249 (criminal code); LAWS OF 1977, 1st Ex. Sess., ch. 291 (Juvenile Justice Act); LAWS OF 1913, ch. 160 (Juvenile Court Law); LAWS OF 1909, ch. 190 (Delinquent Children).[1] Judicial authority is equally limited on the sentencing side of the criminal law equation, where courts have only the sentencing authority granted by the legislature.

---

[1] For an informative history of the criminal culpability of juveniles in Washington and the nation, please see 1980 Op. Att'y Gen. No. 2, at 1-20.

*E.g.*, *State v. Pillatos*, 159 Wn.2d 459, 469, 150 P.3d 1130 (2007) (no inherent authority for courts to adopt sentencing procedure necessary to comply with United States Supreme Court mandate); *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986) (legislature has plenary authority over setting punishments; "the Legislature, not the judiciary, has the authority to determine the sentencing process"); *State v. LePitre*, 54 Wash. 166, 169, 103 P. 27 (1909) (similar).  In short, Washington judges have nothing to do with defining crimes and have only such limited sentencing authority as has been granted them.

This should come as no surprise to any student of political science.  Our court has long recognized that legislative bodies, not judicial bodies, are the policy-making organs of our government:

> Policy-making decisions which are based on careful consideration of public opinion are clearly within the purview of legislative bodies and do not resemble the ordinary business of the courts.

*Raynes v. Leavenworth*, 118 Wn.2d 237, 245, 821 P.2d 1204 (1992).

The determination of the appropriate age to engage in adult activities has long been the subject of congressional and legislative actions.  Indeed, the Constitution of the United States sets the minimum age for participation in our executive and legislative branches.  *See* U.S. CONST. art. I, § 3 (senators must be at least 30); art. I, § 2 (representatives must be at least 25); art. II, § 2 (president must be at least 35).  By the

No. 35957-3-III
*State v. T.M.* (concurring)

terms of the Twenty-Sixth Amendment, the voting age in national elections is 18. In Washington, our constitution likewise directs that voters be age 18, while legislators must meet the requirements imposed on voters. CONST. art. VI, § 1 (voters); art. II, § 7 (legislators).[2]

Our legislature has long exercised its authority to set a minimum age for "adult" activities. Among the current age lines drawn by our legislature include: driver's licenses, RCW 46.20.100 (18 without parental approval); drinking, RCW 66.44.290 (age 21); smoking, RCW 70.155.005 (18, will be 21 at end of this year); consent to sexual intercourse, RCW 9A.44.079 (age 16); marriage, RCW 26.04.010 (18 absent judicial approval); purchase semiautomatic rifle, RCW 9.41.240 (age 21); possession of cannabis, RCW 69.50.357 (age 21); capacity to contract, RCW 26.28.030 (18, but can disaffirm contracts entered before that age); and child labor, RCW 26.28.060-.070 (variable). Although testimonial capacity is no longer based on age, RCW 5.60.050, at one time only those ten and older were capable of testifying. LAWS OF 1877, § 393, at 86, *repealed by* LAWS OF 1986, ch. 195, § 2.

All of these lines, of course, pale in comparison to the legislature's decision to define the "age of majority," otherwise known as adulthood. *See* RCW 26.28.010 (18 unless otherwise specified). The lines drawn by the legislature are not static and have

_____

[2] Washington also sets a maximum age of service for judges (75). CONST. art. IV, § 3(a).

3

moved in both directions, as exemplified by changes to our drinking and smoking ages in the past decades.[3]  When policies need to change, the legislature is up to the task of considering the competing considerations at hand and crafting an appropriate response.

In sum, the legislature has the power to define criminal law and punishments, as well as the power to draw lines, and regularly has exercised its authority in those areas. A court simply cannot invade the legislature's policy choices in this arena and substitute its own policy choices.  Separation of powers prevents that encroachment.

While that is the reason we should not be entertaining T.M.'s argument, his argument also is bad policy.  Drawing lines based on personal maturity rather than group age is a double-edged sword.  For instance, the legislature could decide that the immature should have limited access to adult privileges such as alcohol or marriage or capacity to contract or ability to consent to all sorts of activities that might not be good for the immature young adult.  That approach also could justify being applied to punishment.  If one is immature enough that he is a danger to public safety for failure to conform to the criminal laws, a legislature also could just as easily decide that societal protection

---

[3] The age lines also have treated the sexes unevenly.  Women, for instance, have long enjoyed the right to marry at 18, while men needed to be 21 to marry until the passage of Laws of 1970, 2d Ex. Sess., ch. 17, § 1.

justifies locking him up until and unless a brain scan suggests he is mature enough to engage safely with others.[4]

The authority to exempt an individual from laws of general application is authority to discriminate either in favor of the individual or against the individual. Few of us would desire to live in such a brave new world and we should not usher that world in. The inability of an individual to conform to the laws is properly the question of appropriate punishment rather than excusing the individual from the requirements of the law. Our society mitigates criminal penalties in those instances where immaturity is a significant factor in assessing a youth's moral culpability. *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (mandatory life in prison impermissible for juveniles); RCW 9.94A.730 (sentencing for crimes committed while juvenile); RCW 10.95.030 (sentencing for aggravated murder committed while juvenile). But allowing immaturity to excuse compliance with the law altogether, as T.M. suggests, is both unprecedented and illogical. The only instance where our society currently excuses the inability to comply with the law is the insanity defense, and even those who successfully

---

[4] In the past, courts have not been that merciful. In upholding the capital murder conviction (and subsequent execution) of a twelve-year-old, a New Jersey court referenced a case reported in Blackstone where a ten-year-old had been executed for murder of a child, noting that the English judges had unanimously agreed that the death penalty was appropriate: "sparing this boy merely on account of his tender years, might be of dangerous consequence to the public by propagating a notion that children might commit such atrocious crimes, with impunity." *State v. Guild*, 10 N.J.L. 163, 189 (Sup. Ct. 1828) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES 24).

assert the defense must leave society for treatment until such time as they are able to comply with its mandates. Chapter 10.77 RCW. T.M. does not suggest immaturity is the equivalent of insanity, nor is there any authority that supports such an equivalency.

If immaturity is to become a defense to criminal conduct by amending the definition of intent, it should be a legislative decision to do so. At this point, our legislature has declined to distinguish children from adults with respect to liability for criminal conduct, except for the very young. It has defined the mental states necessary to accomplish criminal activity in universal terms applicable to all without creating a child-centric standard. It alone has the ability to change that definition if it deems such action in the public interest. T.M. must take his arguments to the legislature.

I respectfully concur in the result.

Korsmo, J.